## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| John Pluecker, Obinna Dennar, | ) | |
| Zachary Abdelhadi, and George Hale, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| Ken Paxton, Texas Attorney General; | ) | |
| Board of Regents of the University of Houston | ) | |
| System, in the name of the University of | ) | |
| Houston; the Trustees of the Klein Independent | ) | |
| School District, in the name of the Klein | ) | |
| Independent School District; the Trustees of | ) | |
| the Lewisville Independent School District, | ) | |
| in the name of the Lewisville Independent | ) | |
| School District; and the Board of Regents of | ) | |
| the Texas A&M University System, | ) | |
| in the name of Texas A&M University- | ) | |
| Commerce; | ) | |
| in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1.      Plaintiffs challenge a state law that forces them to choose between their livelihoods and their First Amendment rights.

2.      House Bill No. 89 (the "Act") was enacted during the 2017 legislative session. It requires all who contract with the State of Texas to certify that they are not engaged in boycotts of Israel or territories controlled by Israel.  Contractors who cannot meet this certification requirement or choose not to so certify are prohibited from contracting with the State.

1

3.      The Act defines "boycott Israel" broadly, so as to include taking any action that is intended to limit commercial relations with any person or entity doing business in Israel or in an Israeli-controlled territory (Tex. Gov. Code § 808.001). This would include making a political decision not to purchase products or services offered by Israeli companies or others doing business in Israel or in an Israeli-controlled territory in protest of Israeli governmental policy.

4.      The Act was passed with the goal of targeting companies that take the politically disfavored stance of boycotting Israel, including especially those who participate in Boycott, Divestment, and Sanctions ("BDS") campaigns.  In fact, although the broad definition of "boycott Israel" in the Act does not require that contractors have any formal or other link to a BDS campaign, both Governor Greg Abbott, and the bill's sponsor, Phil King, have referred to the Act as the "Anti-BDS" bill.

5.      BDS campaigns are non-violent and advocate for the rights of Palestinians through encouraging both individuals and state actors to refrain from economic investment in Israel. Although there is no single organization or entity that dictates the message or goals of all BDS campaigns, BDS campaigns generally seek the end of occupation in the West Bank, equal rights for Palestinians in Israel, and the right of return for all Palestinian refugees.  BDS campaigns also reject all forms of discrimination, including Antisemitism and Islamophobia. Progressive Jewish groups, such as Jewish Voice for Peace, also participate in BDS campaigns.

6.      This case is not about the conflict between Israel and Palestine. This case is only about whether a government entity can dictate the political viewpoint of the contractors, including sole proprietors, with whom it does business. The First Amendment protects the rights of individuals and companies to participate in political boycotts.  The State should be prohibited from forcing its own viewpoints on those who boycott Israel.

7.     Plaintiffs are sole proprietors who contract with state governmental entities. These governmental entities have required Plaintiffs to sign a certification, referred to hereafter as the "No Boycott of Israel certification," as a condition of contracting with the State. The certification states that the contractor does not boycott Israel or territories controlled by Israel, and will not engage in such boycotts for the duration of the contract. Plaintiffs have all either lost contracting opportunities because they refused to sign the No Boycott of Israel certification or signed the certification at the expense of their First Amendment rights. Plaintiffs are:

   a.  John Pluecker, a highly regarded freelance writer, artist, interpreter, and translator, who contracts with the University of Houston and has lost two service contracts from the University because of his refusal to certify against his will that he will not boycott Israel;

   b.  Obinna Dennar, a Ph.D. candidate at Rice University, who was forced to forfeit payment for judging at a Klein Independent School District debate tournament because he actively participates in a BDS campaign;

   c.  Zachary Abdelhadi, a Palestinian-American college student at Texas State University, who has had to forego opportunities to judge high school debate tournaments for the Lewisville Independent School District because he boycotts Israel; and

   d.  George Hale, a reporter for KETR, a National Public Radio ("NPR") member station owned and operated by Texas A&M University-Commerce ("TAMUC"), who was forced to sign the Act's No Boycott of Israel certification against his conscience in order to continue working at KETR.

8.     The Act's certification requirement violates the First and Fourteenth Amendments by requiring Plaintiffs and other government contractors to disavow their participation in political boycotts. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in

3

politics, nationalism, religion, or other matters of opinion *or force citizens to confess by word or act their faith therein*." *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943) (emphasis added).

9. Federal District Courts in both Arizona and Kansas have recently blocked similar laws aimed at targeting boycotts of Israel based on First Amendment claims. *Jordahl v. Brnovich*, -- F. Supp. 3d ---, CV-17-08263-PCT-DJH, 2018 WL 4732493 (D. Ariz. Sept. 27, 2018); *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018).

## JURISDICTION AND VENUE

10. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the First and Fourteenth Amendments to the United States Constitution.

11. The case presents a federal question within this Court's jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331 and 1343.

12. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

13. Venue is proper in this Court under 28 U.S.C. § 1391 because some of the parties, including at least one of the Defendants, reside in this District, and a substantial part of the events giving rise to this claim occurred in this District.

## PARTIES

14. Plaintiff John Pluecker is a resident of Houston, Texas. He is a freelance writer, artist, interpreter, and translator.

15. Plaintiff Obinna Dennar is a resident of Houston, Texas. He has contracted with public school districts to judge speech and debate tournaments.

16. Plaintiff Zachary Abdelhadi is a resident of San Marcos, Texas. He attempted to contract with a public school district to judge speech and debate tournaments.

17. Plaintiff George Hale is a resident of Dallas, Texas. He is a reporter who operates as an independent contractor with TAMUC's NPR member station, KETR.

18.     Defendant Ken Paxton is the Texas Attorney General. The principal office of the Attorney General is in Austin, Texas. As the Attorney General, Mr. Paxton is charged with the duty to enforce the Act's certification requirements in light of his general law enforcement responsibilities and the duty to bring enforcement actions against public officials for the misappropriation of state funds, pursuant to Texas Penal Code §§ 1.09 and 39.015. Mr. Paxton has the authority to investigate whether actions of a state agency violate state law, to initiate legal proceedings if he concludes that an agency's actions do or may violate state law, and to prosecute public officials and others for misappropriation of public monies. Mr. Paxton is sued in his official capacity.

19.     The Board of Regents of the University of Houston System oversees the University of Houston, a political subdivision of the State of Texas, and is sued in the name of the University of Houston pursuant to Texas Education Code § 111.33. It has general control and principal contracting authority over the University of Houston. Specifically, the University of Houston is organized and controlled by the Board of Regents pursuant to Education Code § 111.11. The Board of Regents is responsible for enacting bylaws, rules and regulations for the management of the University of Houston (§ 111.35) and approving contracts of the University (§ 111.34). The Board of Regents is sued in its official capacity.

20.     The Trustees of the Lewisville Independent School District oversee the Lewisville Independent School District, a political subdivision of the State of Texas, and are sued in the name of the Lewisville Independent School District ("Lewisville ISD") (Tex. Edu. Code § 11.151). They have the exclusive power and duty to govern and oversee the management of the public schools in the district (§ 11.151(b)). Under § 11.151(c)(4), the Trustees may enter into contracts and delegate contractual authority to the superintendent. The Trustees of Lewisville ISD are sued in their official capacities.

21.     The Trustees of the Klein Independent School District oversee the Klein Independent School District, a political subdivision of the State of Texas, and are sued in

the name of the Klein Independent School District ("Klein ISD") (Tex. Edu. Code § 11.151). They have exclusive power and duty to govern and oversee the management of the public schools in the district (§ 11.151(b)). Under § 11.151(c)(4), the Trustees may enter into contracts and delegate contractual authority to the superintendent. The Trustees of Klein ISD are sued in their official capacities.

22.     The Board of Regents of the Texas A&M University System oversees Texas A&M University-Commerce, a political subdivision of the State of Texas, and is sued in the name of Texas A&M University-Commerce. The Board of Regents manages and controls Texas A&M University-Commerce pursuant to Texas Education Code § 87.551. The Board of Regents has general powers to incur expenditures (§ 85.22) and to enter into contracts (§ 85.18). The Board of Regents is sued in its official capacity.

## STATEMENT OF FACTS

### The Act

23.     In April of 2017, the Texas Legislature enacted HB 89, codified at Texas Government Code § 808.001 *et seq.* and § 2270.001 *et seq.* (collectively, the "Act"). The Act provides, in relevant part:

**Sec. 2270.002. PROVISION REQUIRED IN CONTRACT**.  A governmental entity may not enter into a contract with a company for goods or services unless the contract contains a written verification from the company that it:

(1) does not boycott Israel, and

(2) will not boycott Israel during the term of the contract.

**Sec. 2270.001. DEFINITIONS.** In this chapter:

(1) "Boycott Israel" has the meaning assigned by Section 808.001.

(2) "Company" has the meaning assigned by Section 808.001.

(3) "Governmental entity" has the meaning assigned by Section 2251.001.

**Sec. 808.001. DEFINITIONS.** In this chapter:

(1) "Boycott Israel" means refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory, but does not include an action made for ordinary business purposes.

(2) "Company" means a for-profit sole proprietorship, organization, association, corporation, partnership, joint venture, limited partnership, limited liability partnership, or limited liability company, including a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of those entities or business associations that exists to make a profit.

**Section 2251.001. DEFINITIONS.** Except as otherwise provided by this chapter, in this chapter:

. . .

(3) "Governmental entity" means a state agency or political subdivision of this state.

24.     The Act became effective on September 1, 2017.

25.     The Act seeks to suppress participation in political boycott campaigns aimed at Israel and/or persons or entities doing business in Israel or in an Israeli-controlled territory (including Israeli settlements in occupied Palestinian territories), particularly BDS campaigns. These campaigns seek to protest the Israeli government's treatment of Palestinians and occupation of the Palestinian territories.

26.     Leading up to its passage, Representative Phil King, the Act's author referred to it as "the anti-BDS bill."[1]

27.     Similarly, Texas Governor Greg Abbott proclaimed that he was proud to sign into law "Anti-BDS legislation."[2]  He further stated that, in passing the Act, Texas had "reaffirm[ed] its support for the people of Israel," and that "Anti-Israel policies are Anti-Texas policies."[3]

---

[1] Representative King's statement was reported here: http://jhvonline.com/texas-rep-to-file-antibds-bill-p21849-90.htm.

[2] Governor Abbot's signing statement can be found here: https://gov.texas.gov/news/post/anti-israel-policies-are-anti-texas-policies.

[3] *Id.*

28.     Upon information and belief, prior to the enactment of the Act, none of the State agencies who are defendants in this case had a policy or practice of requiring contractors to certify that they would not boycott Israel. But for the Act, the state agency defendants likely would not be put in the position of requiring their contractors to choose a particular political stance as a condition to doing business with them.

### Mr. Pluecker's Background

29.     Plaintiff John Pluecker is a writer, artist, interpreter, translator, and co-founder of an interpretation collaborative called Antena. His work has appeared in literary journals in the U.S. and Mexico. He has translated numerous high-profile books from Spanish and has presented work in numerous art institutions and universities, including Project Row Houses, Blaffer Art Museum, Pratt Institute, CalArts, Hammer Art Museum, and University of Texas–El Paso. Mr. Pluecker holds degrees from Yale University (B.A.), the University of Houston (M.A.), and the University of San Diego (M.F.A.).

30.     As an interpreter and writer, Mr. Pluecker volunteers his time and talents to various civil rights and immigrant rights organizations. He cares deeply about ensuring that members of the public with limited English ability have language access to and involvement in cultural and political movements.

31.     Through his involvement in the art community and civil rights advocacy, Mr. Pluecker has developed friendships with Palestinian artists and political activists and learned about the Palestinian conflict with Israel. He has family members and friends from the U.S. who have worked on issues relating to the oppression of Palestinians, and he has grown a sense of solidarity with Palestinian causes. He is an active supporter of Palestinian rights and liberation, and supports art exhibits and presentations relating to Palestinian human rights and liberation, including the annual Houston Palestine Film Festival.

32.     Historically, Mr. Pluecker has supported BDS campaigns and other nonviolent strategies because he believes in attempts to promote justice and effectuate human rights in Israel and the Palestinian territories. Specifically, Mr. Pluecker participates in a BDS boycott campaign against Sabra products to protest the company's support for the Israel Defense Forces ("IDF"), a particularly controversial section of the Israeli military.

33.     Mr. Pluecker wishes to retain the right to participate in other BDS campaigns in the future. It would also go against his political and moral beliefs to go on record with or sign on to anything perceived to be an anti-BDS statement.

34.     Mr. Pluecker's support for BDS campaigns is not motivated by his own economic self-interest.

### The University of Houston Contracts

35.     Mr. Pluecker's livelihood depends on providing services as a freelance writer, artist, interpreter, and translator. For the past few years, he has contracted with the University of Houston ("UH") as an independent contractor. The jobs he receives from UH represent an important source of income for Mr. Pluecker.

36.     In March of 2018, a representative of the Blaffer Art Museum at UH contacted Mr. Pluecker to request his services for the translation of an art essay. Because of his prior relationship with UH, Mr. Pluecker agreed on a fixed fee and began work on the translation while he awaited the formal contract from UH. A representative of the Blaffer Art Museum subsequently presented Mr. Pluecker with a Standard Purchasing Agreement for the translation at a fixed price of $1,500 for an initial term from March 23, 2018 to April 15, 2018.

37.     Upon reviewing the contract and before signing, Mr. Pluecker noticed a new provision he had not seen in prior contracts from UH. The Standard Purchasing Agreement contained a No Boycott of Israel certification provision that required Mr.

Pluecker to certify that he does not boycott Israel and would not boycott Israel for the life of the contract.

38.     Mr. Pluecker did not sign the contract. Instead, he crossed out the provision and initialed next to it to indicate his disapproval of that provision in the contract. Mr. Pluecker then submitted to UH a copy of the contract with the crossed out and initialed No Boycott of Israel certification, indicating he did not agree with this provision.

39.     The representative of the Blaffer Art Museum inquired with a supervisor to determine whether the contract with the redacted provision was acceptable, but was informed that Mr. Pluecker would have to sign the Agreement without redactions, and, specifically, with the No Boycott of Israel provision. Mr. Pluecker refused to sign the contract and was forced to forgo payment for the translation work that he had already begun.

40.     Mr. Pluecker was unwilling to sign the contract because he believed it was an intrusion into his free speech rights. Specifically, Mr. Pluecker did not want to disavow his right to participate in Israel boycotts in the future. He also did not want to forfeit his active support of pro-Palestinian presentations and art exhibits relating to BDS campaigns and his participation in a BDS boycott campaign against Sabra. As such, Mr. Pluecker could not have certified that he was not engaged in a boycott of Israel.

41.     A few months later, in September of 2018, a faculty member of UH's Department of Modern and Classical Languages invited Mr. Pluecker to be a guest speaker and workshop leader to a class of college students for a fee of $250. However, the Speaker Agreement Form also included a No Boycott of Israel clause.  Like the first contract, the second UH contract included a certification that Mr. Pluecker "does not boycott Israel" and "will not boycott Israel during the term of this Agreement."

42.     Mr. Pluecker did not sign the second contract because he objected to making the certification. Further, he responded to UH by email correspondence that he would not sign the second contract because "it includes language that requires me to

affirm that I am opposed to the boycott of the State of Israel." Following this correspondence, UH denied Mr. Pluecker the contract and the opportunity to be a guest speaker.

### The Act's Effects on Mr. Pluecker

43.     If not for the Act's certification requirement, Mr. Pluecker would not have to decide whether to pursue work on which he depends as a for-profit, sole proprietor or to sacrifice his First Amendment right to participate in a political boycott of Israel. But for the certification requirement, Mr. Pluecker could have provided professional services to UH while continuing to boycott Sabra brand products and without fear that his political boycotts would violate the Act's certification requirement and subject him to a breach of contract or other risks, including criminal liability for making a false entry on a government record and debarment from future government contracts.  Further, he could have provided professional services to UH while continuing to support art exhibits and presentations relating to Palestinian human rights and liberation, including the annual Houston Palestine Film Festival.

44.     The Act directly prohibits Mr. Pluecker's participation in political boycotts protected under the First Amendment. If Mr. Pluecker signed the certification, he would feel compelled to discontinue his current boycott activity and would have to forgo any future boycott of Israel.

45.     The Act has effectively punished Mr. Pluecker due to the content and viewpoint of his speech. If Mr. Pluecker were engaged in any other type of political boycott, even one of Palestine or a boycott of those companies that participate in BDS campaigns, he would have been able to sign the certification and continue earning income through his contract work with UH. But because the State disagrees with the message of Mr. Pluecker's boycott, his speech has been punished.

46.     The Act's certification requirement also compels Mr. Pluecker's speech. He does not want to sign a public document that declares that he will not boycott Israel. Mr.

Pluecker believes that signing the document would be a public declaration on a position that is contrary to his political beliefs and contrary to his current boycott.  Additionally, it would force him to disavow future participation in BDS campaigns.

47.     The certification requirement chills his individual expression and association. Even though Mr. Pluecker is not directly affiliated with any BDS groups, it is unclear to him whether his current relationships would run afoul of the Act's certification requirement. The certification requirement effectively prevents government contractors from affiliating with individuals and organizations that participate in protected political boycotts. Mr. Pluecker reasonably fears that his vocal advocacy about pro-Palestinian causes, together with his professional and personal relationships with BDS activists, could lead to suspicion that he is participating in a proscribed boycott. He believes that if the Act's certification requirement remains in place for all future state university contracts, he would feel pressure not to promote or discuss his affiliations or his boycott participation in public for fear of losing significant sources of income.

48.     Mr. Pluecker's pro-Palestinian support and current boycott participation has no bearing on his provision of translation or speaking services to UH's arts and language departments. Mr. Pluecker does not, and would not, discriminate against his clients, students or audiences based on any legally protected characteristic. In fact, Mr. Pluecker's professional career revolves around fighting oppression and discrimination through his writings and art.

49.     Although Mr. Pluecker does not want to sign the certification, he would like to continue providing professional services under contract with UH.

**Mr. Dennar's Background**

50.     Plaintiff Obinna Dennar is a graduate student and has judged high school debate tournaments on a contract basis with public school districts since 2015. With the opportunity to judge about 10 tournaments a year, Mr. Dennar uses the income he earns

from judging tournaments to pay for graduate school expenses. Mr. Dennar has judged about 20 tournaments at different school districts, including Klein ISD.

51.     Mr. Dennar is Nigerian-American. His parents settled in Texas in the mid-1990s. Mr. Dennar learned about the conflict between Israel and Palestine from a young age and considers himself an activist for Palestinian rights and liberation. While an undergraduate student at the University of Texas, Mr. Dennar participated in an organization called the Palestinian Solidarity Committee ("PSC") and attended meetings and demonstrations with the PSC. He is an active participant in a BDS campaign and supports its efforts to seek: (1)  an end to what he sees as the Israeli occupation of Palestine, and (2) the right of return for Palestinian refugees. Mr. Dennar participates in a BDS campaign because he opposes Israel's military system. Mr. Dennar believes that his actions are similar to those who called for divestment from South Africa in order to end apartheid. Mr. Dennar's participation in a BDS campaign is not motivated by his own economic self-interest.

52.     In conjunction with the BDS calls for boycott, Mr. Dennar boycotts consumer products offered by businesses supporting Israel's occupation of the Palestinian territories or that, directly or indirectly, economically benefit the state of Israel, including Sabra and L'Oreal. For example, Mr. Dennar avoids buying Sabra products, because he believes the company's ownership supports the IDF and their continued occupation of Palestinian lands and oppression of the Palestinian people. Mr. Dennar participates in this boycott to protest what he believes are Israel's occupation of Palestinian lands, illegal settlements constructed on internationally recognized Palestinian territory, and violations of the human rights of Palestinians. He would not, however, boycott an Israeli company if that company stood against Israel's occupation of Palestinian territories and supported the plight of the Palestinian people, nor would he boycott an American company solely on the basis that its owner was of Israeli origin. He has participated in the boycott of

Israel since 2015 and has associated with others engaged in BDS campaigns through his political purchasing decisions, his political views, and his affiliation with Palestinian justice organizations. Mr. Dennar is currently a member of the National Students for Justice in Palestine ("NSJP") and NSJP's Houston Chapter, SJP-Houston. His activities for NSJP and SJP-Houston include educational presentations, college tabling, and attending meetings relating to Palestinian justice.

### The Klein ISD Contract

53.     In 2017, Mr. Dennar contacted Klein High School's debate coordinator to serve as a judge for an upcoming debate tournament. After being approved by the coordinator, Mr. Dennar drove from Austin to Houston to judge at the tournament on a Friday evening and all day Saturday. Mr. Dennar was told that he would need to sign a contract in order to be paid, but that he could sign it after he finished judging.  Assuming that the contract would be similar to ones he had signed in the past, Mr. Dennar waited until the end of the tournament to ask for the contract.

54.     After the tournament, Klein ISD provided him with an Independent Contractor Agreement, which included a form titled "Certification Regarding Terrorist Organizations and Boycott of Israel," and specifically included the certification language required by the Act.  Mr. Dennar was required to sign the boycott form in order to be paid.

55.     Mr. Dennar refused to sign the certification because he believes he is engaged in a boycott of Israel and determined he could not sign the form.  As such, he never submitted the Klein ISD contract and accompanying forms, and, therefore, was never paid for his work at the tournament.

56.     In August of 2018, Mr. Dennar attempted to judge at a different speech and debate tournament, this time at another school. Before he went to the tournament, Mr. Dennar was given a contract to review that again included the No Boycott of Israel

14

language.  Mr. Dennar could not sign the contract because he is engaged in a boycott of Israel, and thus lost out on the opportunity to judge at the tournament.

57.     Because he now understands that all Texas public high schools are required to include the No Boycott of Israel certification, Mr. Dennar has been forced to forgo any contract work as a judge at public high school debate tournaments in the state. Mr. Dennar objects to making the certification and does not want to go against his political beliefs by signing the certification.

### The Act's Effects on Mr. Dennar

58.     If not for the Act's certification requirement, Mr. Dennar would have contracted to judge debate tournaments without regard to his political views about BDS. With the possibility of judging about 10 tournaments a year, the Act has already caused Mr. Dennar to lose income amounting to over $1,000.

59.     The Act directly prohibits Mr. Dennar's participation in political boycotts protected under the First Amendment. If Mr. Dennar signed the certification, he would feel compelled to discontinue his current boycott activity and would have to forgo any future boycott of Israel.

60.     Further, the Act prevents government contractors from affiliating with individuals and organizations that participate in protected political boycotts. In order to comply with the Act, Mr. Dennar would likely have to forfeit his BDS-related activities, including his past and present affiliations with pro-Palestine organizations, like PSC, SJP-Houston, and NSJP, which engage in BDS campaigns.

61.     The Act has effectively punished Mr. Dennar for the content and viewpoint of his speech.  If Mr. Dennar were engaged in any other type of political boycott, even one of Palestine or of those companies that engage in BDS campaigns, he would have been able to sign the certification and earn income as a speech and debate judge. But

because the State disagrees with the message of Mr. Dennar's boycott, his speech has been punished.

62.     The Act also compels Mr. Dennar's speech about a matter of great political controversy that is unrelated to his work. Mr. Dennar does not want to sign a public document that declares that he will not boycott Israel. Mr. Dennar believes that signing the document would be a public declaration about a position that is contrary to his political beliefs. Additionally, it would force him to disavow future participation in BDS campaigns.

63.     The Act chills his individual expression and association. Mr. Dennar operates as a for-profit, sole proprietor to whom the certification explicitly applies. He reasonably fears that his boycott of Israel, as well as his vocal advocacy about his BDS participation and his past and present affiliations with pro-Palestine organizations, like PSC, SJP-Houston, and NSJP, would violate the certification. Mr. Dennar wants to judge debate tournaments at Texas public schools in the future, but does not believe he can do so without disavowing his political expression and association rights. Because he would like to judge tournaments in the future, he still feels pressure about and is not sure how to promote or discuss his boycott participation in public.

64.     Mr. Dennar's boycott participation has no bearing on his provision of high school debate judging services to Klein ISD. Mr. Dennar does not, and would not, discriminate against student debaters based on any legally protected characteristic.

65.     Although Mr. Dennar does not want to sign the certification, he would like to provide debate judging services under contract with Klein ISD and other Texas public school districts.

### Mr. Abdelhadi's Background

66.     Plaintiff Zachary Abdelhadi is a sophomore at Texas State University in San Marcos, Texas, majoring in Public Administration. After high school, he looked forward to judging debate tournaments for Lewisville ISD, where he had the opportunity

to judge about 15 tournaments a year, representing an important source of income to pay for his college expenses.

67.     Mr. Abdelhadi is Palestinian-American. His father is from Palestine, and his mother was born in the U.S. Through his father and older sister, Mr. Abdelhadi learned about the conflict between Israel and Palestine, and he considers himself an activist for Palestinian rights and liberation. He actively participates in BDS boycott campaigns because he agrees with their efforts to seek an end to the Israeli occupation of Palestinian homelands, equal rights for Israeli Arabs, and the right of return for Palestinians. He learned about BDS through his family members who also participate in BDS. Mr. Abdelhadi's participation in BDS is not motivated by his own economic self-interest.

68.     In conjunction with BDS campaigns, Mr. Abdelhadi boycotts consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories. Mr. Abdelhadi does not boycott all Israeli companies; he boycotts only those supporting Israel's occupation of Palestinian territories, those that support Israeli policies that oppress Palestinian people, or those supporting the IDF. For example, Mr. Abdelhadi avoids using booking services such as VRBO that list vacation rental homes in what Mr. Abdelhadi believes are illegal Israeli settlements. He also avoids purchasing PepsiCo and Strauss Group products as a result of their purported affiliation with the IDF. And he avoids purchasing HP products due to what Mr. Abdelhadi believes are their technological contributions to the IDF. Mr. Abdelhadi participates in these boycott campaigns to protest both the occupation and the settlements, which he believes violate the human rights of Palestinians. He has engaged in these boycotts of Israel since 2012 and considers himself a participant in BDS campaigns.

### The Lewisville ISD Contract

69.     Soon after Mr. Abdelhadi graduated from high school, his former debate teacher offered him a chance to judge debate tournaments. Mr. Abdelhadi expressed a

desire to do so as a for-profit, sole proprietor, knowing he could use the money from the tournaments to help pay for college expenses.

70.     In June of 2017, Mr. Abdelhadi's former debate teacher sent him the Lewisville ISD School Contractor/Consultant Form for speech and debate judging, which included a form with a heading "Not [sic] Boycott Israel." The No Boycott of Israel form included the definitions of "Boycott Israel" and "Company" referenced in the Act. Mr. Abdelhadi was required to sign the form to judge debate tournaments.

71.     Mr. Abdelhadi's debate teacher, who knew his family was Palestinian and was aware of his political views, had noticed the anti-boycott form now being required by Lewisville ISD and told him that she knew he would not be happy about it when she emailed him the form.

72.     Mr. Abdelhadi refused to sign the certification and told his debate teacher, "I'm sorry I can't sign it, because I boycott Israel." Because of Mr. Abdelhadi's political beliefs and association with a BDS campaign, he was unable to secure debate tournament judging opportunities with the Lewisville ISD. In addition, he was not able to join some of his former team members and friends, who do not have the same political beliefs as Mr. Abdelhadi and thus currently contract with Lewisville ISD as debate judges.

73.     Mr. Abdelhadi has not signed the Lewisville ISD form, because he objects to making the certification and does not want to violate his political beliefs by signing the certification.   Additionally, it would force him to disavow his current and future participation in BDS campaigns.

### The Act's Effects on Mr. Abdelhadi

74.     If not for the Act's certification requirement, Mr. Abdelhadi would have participated in judging debate tournaments without regard to his political views about BDS. With the possibility of judging about 15 tournaments a year, the requirements of the Act have already caused Mr. Abdelhadi to lose income amounting to over three

semesters' worth of textbooks, several vehicle payments, or several months of rent in San Marcos.

75.     The Act directly prohibits Mr. Abdelhadi's participation in political boycotts protected under the First Amendment. If Mr. Abdelhadi signed the certification, he would feel compelled to discontinue his current boycott activity and would have to forgo any future boycott of Israel.

76.     The Act has effectively punished Mr. Abdelhadi because of the content and viewpoint of his speech.  If Mr. Abdelhadi were engaged in any other type of political boycott, even one of Palestine or of companies that participate in BDS campaigns, he would have been able to sign the certification and earn income as a speech and debate judge.  But because the State disagrees with the message of Mr. Abdelhadi's speech, he is being punished for it.

77.     The Act also compels Mr. Abdelhadi's speech about a matter of great political controversy that is unrelated to his work. Mr. Abdelhadi does not want to sign a public document that declares that he will not boycott Israel. Mr. Abdelhadi believes that signing the document would be a public declaration on a position that is contrary to his beliefs.

78.     The certification requirement chills his individual expression and association. Because Mr. Abdelhadi intends to operate as a for-profit, sole proprietor to whom the certification explicitly applies, if he were given the chance to judge high school debates at any public school district in Texas, Mr. Abdelhadi could not continue his participation in a BDS campaign and reasonably fears that his advocacy about his boycott participation would lead to suspicion about whether he is complying with the certification and that he would again be denied the opportunity to serve as a debate judge. Because he would like to judge tournaments in the future, he still feels pressure about and is not sure how to promote or discuss his boycott participation in public.

79.     Mr. Abdelhadi's boycott participation has no bearing on his provision of high school debate judging services to Lewisville ISD. Mr. Abdelhadi does not, and would not, discriminate against student debaters based on any legally protected characteristic.

80.     Although Mr. Abdelhadi does not want to sign the certification, he would like to provide debate judging services under contract with Lewisville ISD.

### Mr. Hale's Background

81.     George Hale is a radio reporter for KETR, the NPR station for northeast Texas, which is licensed to Texas A&M University-Commerce. Mr. Hale is also the host and lead reporter of KETR's investigative radio series and podcast, "Buried." He also produced a radio story touching on the Israeli-Palestinian conflict that concerned the mislabeling of products of Palestinian origin.[4] Unlike full-time staff members at KETR, who are employees of TAMUC, Mr. Hale has worked as an independent contractor with TAMUC since joining the radio station. Thus, he operates as a for-profit sole proprietorship in conjunction with his work for KETR.

82.     Mr. Hale joined KETR in 2016 after spending nearly eight years reporting on the Israeli-Palestinian conflict for various news agencies, including an independent television news network that has received part of its funding through the U.S. Agency for International Development. Overseas, he has reported from Israel, the Palestinian territories, Egypt, and Jordan. From September 2008 to May 2016, he lived full-time in Bethlehem, an ancient city located entirely within the Israeli-occupied West Bank and under the control of the Palestinian Authority. Mr. Hale earned a bachelor's degree in International Affairs from The George Washington University in Washington, D.C., where he concentrated on Middle East security policy and Semitic languages.

---

[4] http://www.ketr.org/post/neiman-marcus-accused-selling-mislabeled-west-bank-imports

83.     Coupled with his academic and journalistic work, Mr. Hale's experience of living with Palestinians in Bethlehem helped to shape his political beliefs relating to the Israeli-Palestinian conflict. Despite having lived within the internationally recognized Palestinian territory, Mr. Hale had to go through checkpoints and roadblocks operated by Israeli security forces just to travel in and out of Bethlehem. Upon entering and exiting Israel, Mr. Hale was subjected to numerous strip searches and prolonged questioning about his work. He was exposed to tear gas in his apartment and car from Israeli forces on a regular basis. These dehumanizing experiences helped him to understand Palestinian complaints about living under Israeli military control. Mr. Hale considers himself to be politically aligned with the Palestinian people and supports their struggle for liberation and fight against what they perceive as Israeli oppression and occupation. Mr. Hale does not support violence against civilians as a means to achieve that outcome. For this reason, he generally agrees with and supports non-violent, Palestinian-led BDS campaigns.

84.     While not directly affiliated with any BDS group or currently active in BDS campaigns, Mr. Hale was aware of the Israel boycotts and covered them in his reporting. He generally agrees with and supports the goals of BDS campaigns, including their call for an end to the Israeli occupation of the Palestinian territories, equal rights and respect for human rights for Israeli Arabs, and the right of return for Palestinian refugees.

85.     Mr. Hale maintains professional relationships and personal friendships with journalists who are pro-Israel, pro-Palestine, Israeli citizens, and Palestinian citizens, some of whom participate in BDS campaigns. Mr. Hale is also on mailing lists with pro-Palestinian groups and has previously made the conscious choice to avoid purchasing certain products originating from areas controlled by Israel. In solidarity with BDS campaigns and Palestinians in general, Mr. Hale has boycotted consumer goods offered by businesses supporting Israel's occupation of the Palestinian territories in the past. For example, when buying gifts, he chose alternatives to Israel's popular Dead Sea cosmetics company, Ahava, because some of its operations are conducted in the West Bank. He

also avoided buying Hewlett Packard ("HP") products due to Mr. Hale's understanding of its role in the ID system that Israel uses to control Palestinian movement. Mr. Hale supported this boycott to protest both the Israeli occupation and the settlements, which he believes violate the human rights of Palestinians.

86.     Mr. Hale discontinued his boycott activity because he was forced to sign the Act's No Boycott of Israel certification.

## The Texas A&M University-Commerce Contract

87.     In February of 2018, TAMUC contracted with Mr. Hale to provide the KETR general manager with edited, ready-for-air audio cut segments of the Buried podcast series, which began in September 2017. The contract appeared to be a standard Services Agreement from TAMUC, but it contained a provision that had not appeared in prior contracts for Mr. Hale, namely, a "Contractor Certification Regarding Boycotting Israel."

88.     Knowing Mr. Hale's political inclinations, the station's general manager told Mr. Hale that he was aware Mr. Hale would not like one of the provisions. Mr. Hale made it clear to his general manager that he did not approve of the certification provision and questioned why it was included. However, because Mr. Hale was currently committed to an ongoing investigative project, he did not feel that he could quit midway through his work, and, therefore, he signed the contract.

89.     For months afterward, his discomfort from signing a contract with a No Boycott of Israel provision grew. Mr. Hale felt a moral conflict with how the No Boycott of Israel certification limited what he could say and do. Mr. Hale was upset that he was forced to disavow and effectively discontinue his boycott.  Further, Mr. Hale felt very uncomfortable with the idea that the State of Texas would require other public radio journalists to disavow protected expression and association related to the Israeli-Palestinian conflict, based simply on Texas's hostility to expression and expressive conduct supporting Palestinian rights.

22

90.     In August of 2018, Mr. Hale became aware that his contract was about to come up for renewal. Prior to viewing the renewal contract, Mr. Hale expressed concerns about signing another contract with an anti-BDS clause. Mr. Hale asked his supervisor if it was possible to remove the clause from the contract on the grounds that he believed it violated his rights to free speech and free association.

91.     When presented with a portion of the revised contract in early September of 2018, Mr. Hale requested that the anti-BDS clause be removed from the Services Agreement. His supervisor referred Mr. Hale's questions about the No Boycott of Israel certification up TAMUC's chain of command, and it reached the Texas A&M University System's Office of the General Counsel. A representative of TAMUC confirmed that the certification provision was a requirement of the State of Texas.

92.     Not content with this requirement and wishing to memorialize his disapproval of the certification requirement, Mr. Hale attempted to sign the contract under protest and indicated so in a notation on the signed copy he submitted on October 9, 2018.

93.     After Mr. Hale's supervisor submitted the contract to Brian A. McGinley, Jr., TAMUC's Assistant Director of Procurement Services, Mr. McGinley swiftly rejected Mr. Hale's notation and stated, "He can sign a clean copy or he won't work. We are not forcing him to sign under duress or protest."

94.     Faced with the bleak prospect of losing his job, Mr. Hale had no choice but to sign the contract in order to complete his commitments and earn a living. Mr. Hale signed the TAMUC contract on October 10, 2018, despite his clear and known objection to making the certification.

## The Act's Effects on Mr. Hale

95.     If not for the Act's certification requirement, Mr. Hale would not have had to disavow his boycott in order to keep his job. As a result of signing the certification, Mr. Hale has been forced to discontinue his boycott. He reasonably fears that any

boycott-related action – such as refusing to purchase Ahava products, HP products, or Israeli produce, or otherwise supporting a BDS campaign – would violate his certification. Such a violation would make him liable for breach of contract and could expose him to other risks, including criminal liability for making a false entry on a government record and debarment from future government contracts.

96.     The Act has harmed Mr. Hale based on the content and viewpoint of his speech.  If Mr. Hale were engaged in any other type of political boycott, even one of Palestine or of companies that participate in BDS campaigns, he would have not been forced to choose between earning a living and sacrificing his First Amendment rights. But because the State disagrees with the message of Mr. Hale's speech, he has been forced to disavow this protected form of expressive conduct.

97.     The Act's certification requirement also compels speech about a matter of great political controversy that is unrelated to Mr. Hale's current work. Mr. Hale does not want to sign a public document that declares that he will not boycott Israel. Mr. Hale believes that signing the document would be a public declaration on a position that is contrary to his own personal and political beliefs.

98.     It is unclear to Mr. Hale whether his current relationships run afoul of the Act's certification requirement. The certification requirement potentially prevents government contractors from affiliating with individuals and organizations that participate in protected political boycotts. Mr. Hale maintains professional relationships and friendships with journalists who participate in BDS campaigns. Further, he has personal acquaintances who have worked on issues relating to the oppression of Palestinians, which may be construed as supporting BDS. Mr. Hale cannot be sure that his affiliations and support of pro-Palestinian issues would not be seen as dealing with or taking any action "intended to penalize, inflict economic harm on, or limit commercial relations" with Israel. In order to comply with the certification, Mr. Hale feels that having these relationships could draw attention to his support for BDS campaigns. If not for the

certification requirement, Mr. Hale would not worry about his conduct or political beliefs being possibly construed as supporting a boycott of Israel.

99.     The certification requirement chills his individual expression and association. Because Mr. Hale is a for-profit sole proprietor to whom the certification explicitly applies, he reasonably fears that vocal advocacy about his personal affiliation with Palestinian causes would lead to suspicion about whether he is complying with the certification. As a result of the Act's No Boycott of Israel certification requirement, Mr. Hale feels pressure not to promote or discuss his views, affiliations or his past boycott participation in public for fear of losing significant sources of income.

100.    Mr. Hale's pro-Palestinian support and past boycott participation has no bearing on his provision of investigative journalism podcast segments to TAMUC's KETR radio station. Mr. Hale does not, and would not, discriminate against colleagues, guests, or listeners based on any legally protected characteristic.

101.    Although Mr. Hale does not want to sign the certification, he has been compelled to sign it in order to keep his livelihood. He would like to continue providing professional services under contract with TAMUC without having to sign the certification and without being bound by it. Were it not for the certification, Mr. Hale would resume his previous boycott participation.

## CAUSES OF ACTION

### VIOLATION OF FIRST AND FOURTEENTH AMENDMENT RIGHTS
### (42 U.S.C. § 1983)

102.    Plaintiffs restate and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

103.    In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

104.    The politically motivated boycott of consumer goods and services offered by companies operating in Israel, and/or Israeli settlements in the occupied Palestinian territories, is speech and expressive activity related to a matter of public concern. Therefore, it is protected by the First Amendment.

105.    Participation in this boycott, together with others who use boycott, divestment, and sanctions tactics, is protected association under the First Amendment.

106.    Participation in this boycott is protected expression on a matter of public concern.

107.    **Unconstitutional Condition on Government Contract:** The Act's certification requirement violates the First Amendment, both on its face and as applied, because it unduly restricts a government contractor's ability to engage in core political expression and expressive activity, including participation in political boycotts. The State may not condition contract work on the sacrifice of First Amendment rights.

108.    **Content and Viewpoint Discrimination:** The Act's certification requirement violates the First Amendment, both on its face and as applied, because it discriminates against protected expression based on the expression's content and viewpoint. The Act prohibits government contractors from boycotting Israel, Israeli businesses, or businesses supporting Israel's occupation of the Palestinian territories, while allowing contractors to participate in other boycotts, including boycotts of other foreign countries and "reverse boycotts" targeting companies engaged in boycotts of Israel.

109.    **Vagueness:** The Act's certification requirement violates the Fourteenth Amendment's due process requirements because its terms are vague. The Due Process Clause requires that a law give reasonable notice of what conduct it prohibits. The Act fails to give government contractors fair notice of what constitutes a boycott of Israel and whether Plaintiffs' activities and associations would be construed as violating the

Act's certification requirement, under the Act's definitions. Government contractors who violate the Act's provisions are subject to forfeiture of payment by the pertinent state agency and possible liability for breach of contract, as well as criminal liability for making a false entry on a government record and debarment from future state contracts. The Due Process Clause prohibits livelihoods from being subject to such indeterminate, amorphous, and subjective definitions.

110.   **Ideological Litmus Test and Compelled Speech:** The Act's certification requirement violates the First Amendment, both on its face and as applied, because it imposes an ideological litmus test and compels speech related to government contractors' protected political beliefs, associations, and expression.

111.   **Discrimination Based on Political Associations:** The certification requirement violates the First Amendment, both on its face and as applied, because it bars individuals and entities from  contracting with the State based on their protected political associations.


## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award the following relief:

A.     Declare that the Act's certification requirement violates the First and Fourteenth Amendments of the United States Constitution, both on its face and as applied to Plaintiffs;

B.     Preliminarily and permanently enjoin Defendants[5] from requiring government contractors to certify that they are not currently or would in the future be

---

[5] "Defendants" includes their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction.

engaged in boycotts of Israel and from penalizing government contractors based on their participation in political boycotts of Israel;

C.     Alternatively, preliminarily and permanently enjoin Defendants[6] from requiring Plaintiffs to certify that they are not currently engaged in a boycott of Israel and from penalizing them based on their participation in a political boycott of Israel;

D.     Award Plaintiffs their costs and reasonable attorneys' fees in this action; and

E.     Grant Plaintiffs such other relief as this Court may deem just and proper.

---

[6] "Defendants" includes their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction.

Respectfully submitted,

*/s/ Edgar Saldivar*
Edgar Saldivar, TX Bar No. 24038188
Thomas Buser-Clancy, TX Bar No. 24078344
Andre Segura, TX Bar No. 24107112*
Adriana Piñon, TX Bar No. 24089768
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 325-7011
Fax: (713) 942-8966
esaldivar@aclutx.org
tbuser-clancy@aclutx.org
asegura@aclutx.org
apinon@aclutx.org

Brian Hauss, NY Bar No. 5437751**
Vera Eidelman, CA Bar No. 308535**
American Civil Liberties Union Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org
veidelman@aclu.org

Kevin Dubose, TX Bar No. 06150500*
Alexander, Dubose, Jefferson & Townsend
1844 Harvard Street
Houston, TX 77008
Telephone: (713) 522-2358
Fax: (713) 522-4553
kdubose@adjtlaw.com

ATTORNEYS FOR PLAINTIFFS

* Applications for admission are forthcoming/pending
**Applications for *pro hac vice* forthcoming