**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| Pluecker *et al.* | ) | |
| , | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-01100-RP |
| | ) | |
| Paxton, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |


**MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**INTRODUCTION AND OVERVIEW** ......................................................................... 1

**FACTUAL BACKGROUND** ...................................................................................... 3

I.     The Act was passed in 2017, with accompanying statements of intent. ................... 3

II.    The Act has harmed Plaintiffs.................................................................................. 5

   A.    John Pluecker ....................................................................................................... 5

   B.    Obinna Dennar .................................................................................................... 7

   C.    Zachary Abdelhadi ............................................................................................ 10

   D.    George Hale........................................................................................................ 11

**ARGUMENT**.............................................................................................................. 15

I.     Plaintiffs are likely to prevail on the merits ........................................................ 16

   A.    The Act unconstitutionally conditions contract work on the sacrifice of First Amendment rights ............................................................................................ 16

      1.    Political boycotts are protected under the First Amendment ......................... 16

      2.    The State may not force Plaintiffs to choose between their First Amendment rights and contract work. .............................................................................. 19

   B.    The Act Impermissibly Suppresses Political Boycotts of Israel Based on their Content and Viewpoint....................................................................................... 23

   C.    The Act compels speech in violation of the First Amendment. ......................... 27

   D.    The Act is impermissibly vague ........................................................................ 29

II.    Plaintiffs will continue to suffer irreparable harm absent a preliminary injunction 33

III.   The balance of equities weighs heavily in Plaintiffs' favor.................................... 34

IV.   The public interest will be served by issuing a preliminary injunction. ................. 34

       **CONCLUSION** ............................................................................................... 35

**Cases**

*Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*,
133 S. Ct. 2321 (2013) ............................................................................................. 28

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492, 508 (1988) ......................................................................................... 17

*Associated Builders & Contractors of Se. Texas v. Rung*,
1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ............................. 20, 29

*Baird v. State Bar of Arizona*,
401 U.S. 1 (1971) ................................................................................................ 27, 28

*Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*,
518 U.S. 668 (1996) ...................................................................................... 19, 20, 28

*Boos v. Barry*,
485 U.S. 312 (1988) ................................................................................................. 26

*Branton v. City of Dallas*,
272 F.3d 730 (5th Cir. 2001) ................................................................................... 21

*Byrum v. Landreth*,
566 F.3d 442 (5th Cir. 2009) ................................................................................... 15

*Cole v. Richardson*,
405 U.S. 676 (1972) ................................................................................................. 28

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980) ................................................................................................. 24

*Cramp v. Bd. of Pub. Instruction of Orange County, Fla.*,
368 U.S. 278 (1961) ................................................................................................. 30

*Deerfield Medical Center v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981) ................................................................................... 33

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................................ 33, 34

*F.T.C. v. Superior Court Trial Lawyers Ass'n*,
493 U.S. 411 (1990) ................................................................................................. 17

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ........................................................................ 30

*Henry v. National Bank of Clarksdale*,
  595 F.2d 291 (5th Cir. 1979) ............................................ 16, 17, 21

*Homans v. City of Albuquerque*,
  264 F.3d 1240 (10th Cir. 2001) ...................................................... 35

*Hoover v. Morales*,
  164 F.3d 221 (5th Cir. 1998) .................................................... 22, 23

*Horton v. City of Houston, Tex.*,
  179 F.3d 188 (5th Cir. 1999) .................................................... 25, 26

*Janus v. Am. Fed'n of State, County, & Mun. Employees, Council 31*,
  138 S. Ct. 2448 (2018) ................................................................... 22

*Jordahl v. Brnovich*,
  336 F. Supp. 3d 1016 (D. Ariz. 2018) ................................... passim

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*,
  385 U.S. 589 (1967) ........................................................................ 19

*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) .......................................................... 22

*Koontz v. Watson*,
  283 F. Supp. 3d 1007 (D. Kan. 2018) .................................... passim

*Lane v. Franks*,
  573 U.S. 228 (2014) ........................................................................ 21

*NAACP v. Button*,
  371 U.S. 415 (1963) ........................................................................ 30

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) .......................................... 16, 17, 18, 21

*Nat. Inst. Of Family and Life Advocates v. Becerra*,
  138 S.Ct. 2361 (2018) ..................................................................... 24

*Nat'l Ass'n of Mfrs. v. SEC*,
  748 F.3d 359 (D.C. Cir. 2014) ....................................................... 29

*O'Hare Truck Serv., Inc. v. City of Northlake,*
  518 U.S. 712 (1996) ............................................................................................ 28

*Opulent Life Church v. City of Holly Springs, Miss.,*
  697 F.3d 279 (5th Cir. 2012) ....................................................................... 33, 35

*Oscar Renda Contracting, Inc. v. City of Lubbock, Tex.,*
  463 F.3d 378 (5th Cir. 2006) .............................................................................. 20

*Perry v. Sindermann,*
  408 U.S. 593, 597 (1972) .............................................................................. 19, 20

*Pickering v. Bd. of Edu.,*
  391 U.S. 563 (1968) ............................................................... 20, 21, 22, 23

*Planned Parenthood of Gulf Coast, Inc. v. Gee,*
  862 F.3d 445 (5th Cir. 2017) .............................................................................. 35

*Police Dept. of Chicago v. Mosley,*
  408 U.S. 92 (1972) ................................................................................................ 24

*Reed v. Town of Gilbert, Ariz.,*
  135 S. Ct. 2218 (2015) ........................................................................................ 25

*Robinson v. Reed,*
  566 F.2d 911 (5th Cir. 1978) .............................................................................. 29

*Rosenberger v. Rector and Visitors of Univ. of VA,*
  515 U.S. 819 (1995) ............................................................................................. 24

*Smith v. Goguen,*
  415 U.S. 556 (1974) ............................................................................................. 30

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ............................................................................................. 21

*Texans for Free Enter. v. Texas Ethics Com'n,*
  732 F.3d 535 (5th Cir. 2013) .............................................................................. 35

*United States v. Nat'l Treasury Employees Union,*
  513 U.S. 454 (1995) ..................................................................................... 22, 23

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................................. 24

*West Virginia Bd. of Ed. v. Barnette,*
   319 U.S. 624 (1943)...................................................................................... 27

*Wooley v. Maynard*,
   430 U.S. 705 (1977)...................................................................................... 27

**Texas Statutes**

Tex. Gov't Code § 808.001............................................................................ 19, 31, 32
Tex. Gov't Code § 2270.002 ................................................................................ 3, 19

## INTRODUCTION AND OVERVIEW

In 2017, the Texas Legislature passed House Bill 89 ("the Act"), which requires

contractors who want to work for the State—or any of its political subdivisions or agencies,

including counties, public school districts, and public universities—to sign a statement certifying

that they are not participating in boycotts of Israel or territories controlled by Israel, and will not

engage in such boycotts for the life of the contract.  The intent and effect of the Act is clear: to

exclude companies, including sole proprietors like Plaintiffs, that take a political stance

disfavored by the government from contracting with the State or any other governmental entities.

Two federal courts have already enjoined Israel anti-boycott laws that are strikingly similar to

the one at issue here, after concluding that those challenging the laws were likely to succeed on

the merits of their First Amendment claims. *See Koontz v. Watson*, 283 F. Supp. 3d 1007 (D.

Kan. 2018); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018).

This case is not about the conflict between Israel and Palestine.  This case is about only

whether a government entity can dictate the political viewpoint of contractors, including sole

proprietors, with whom it does business.  The First Amendment protects the rights of companies

and individuals to participate in political boycotts.  Just as the State of Texas could not have

denied contracts to those boycotting South Africa's Apartheid government, so too is the State

prohibited from enforcing its own viewpoints on those who boycott Israel or Israeli-controlled

territories.

Plaintiffs are sole proprietors who have been forced to choose between contracting for

work with the State and exercising their First Amendment right to politically boycott.  They

request that this Court issue a preliminary injunction against the enforcement of the Act.

Plaintiffs satisfy the requirements for a preliminary injunction:

Plaintiffs are likely to succeed on the merits of their claims that the Act violates the First and Fourteenth Amendments. *First*, courts have long recognized that the right to engage in political boycotts is protected by the First Amendment; the State may not condition employment or contract work on the sacrifice of constitutional liberties. *Second*, the Act codifies impermissible content and viewpoint discrimination. The Act targets political boycotts of Israel, and only boycotts of Israel, because they carry a viewpoint disfavored by the State. *Third*, the Act compels contractors to reveal their stance on an issue of political controversy even though the choice to boycott Israel is fundamentally unrelated to the jobs for which they are contracting. The First Amendment protects against compelled speech regarding such sensitive matters where it is irrelevant to the purpose of the contracted work. *Finally*, the Act is unconstitutionally vague. The Act targets those engaged in Boycott, Divestment and Sanctions ("BDS") campaigns against Israel; however, in the Legislature's zeal to punish the maximum amount of disfavored expression, the Act was drafted such that a person of ordinary intelligence could not discern whether their actions fall under the statute's definition of "Boycott Israel."

Absent a preliminary injunction, Plaintiffs will continue to be irreparably harmed by the law. Constitutional violations, and especially infringements of First Amendment rights, constitute irreparable harm. Plaintiffs Pluecker, Dennar, and Abdelhadi have been denied opportunities at contracted work because of their refusal to sign the No Boycott of Israel certification, while Plaintiff Hale has been forced to sacrifice his First Amendment rights in order to continue earning a living. In all these cases, and for all contractors and would-be contractors throughout the State, the Act continues to impose an unconstitutional choice: either disavow participation in protected boycotts or forfeit the opportunity to work for any public entity. The balance of the equities and the public interest also weigh heavily in favor of issuing a

permanent injunction: The State has no legitimate interest in enforcing an unconstitutional law, and the public interest is always served by protecting the First Amendment.

<h1 style="text-align:center">FACTUAL BACKGROUND</h1>

**I.     The Act was passed in 2017, with accompanying statements of intent.**

The Act became effective on September 1, 2017.  It provides that "a governmental entity may not enter into a contract with a company for goods or services unless the contract contains a written verification from the company that it: (1) does not boycott Israel; and (2) will not boycott Israel during the term of the contract."  Tex. Gov't Code § 2270.002.  "Company" is defined as "a for-profit sole proprietorship, organization, association, corporation, partnership, joint venture, limited partnership, limited liability partnership, or limited liability company, including a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of those entities or business associations that exists to make a profit."  *Id.* at § 808.001 (2).

"Boycott Israel" is defined as "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory, but does not include an action made for ordinary business purposes."  *Id.* at §808.001(1).

Statements by both the author of the Act, Representative Phil King, and Governor Greg Abbott make clear that the Act was intended to target BDS campaigns.  BDS campaigns are non-violent and advocate for the rights of Palestinians through encouraging individuals, companies, and state actors to refrain from providing economic support to the Israeli government, and to Israeli and international companies that allegedly violate Palestinian human rights.  Decl. of Christopher Clay at Ex. 1 (citing https://bdsmovement.net/what-is-bds); Decl. of Zachary

Abdelhadi at ¶¶ 5-7; Decl. of Obinna Dennar at ¶¶ 4-5; Decl. of George Hale at ¶ 6. Although there is no single organization or entity that dictates the message or goals of all BDS campaigns, BDS campaigns generally seek the end of occupation in the West Bank, equal rights for Arab-Palestinian citizens of Israel, and the right of return for all Palestinian refugees. Clay Decl. at Ex. 1. BDS campaigns also reject all forms of discrimination, including Antisemitism and Islamophobia. Progressive Jewish groups, such as Jewish Voice for Peace, also participate in BDS campaigns. *Id.* BDS campaigns are inspired by the South African anti-apartheid movement. *Id.*; *see also* Dennar Decl. at ¶ 4.

Leading up to its passage, Representative King referred to the Act as "the anti-BDS bill," and characterized BDS campaigns as "economic warfare." Clay Decl. at Ex. 2 (citing http://jhvonline.com/texas-rep-to-file-antibds-bill-p21849-90.htm ). When Governor Abbot signed the Act into law, he referred to it as the "Anti-BDS" bill, and stated that he was proud to have signed "Anti-BDS legislation." Clay Decl. at Ex. 2 (https://gov.texas.gov/news/post/anti-israel-policies-are-anti-texas-policies).

Additional statements surrounding the passage of the Act confirm that it was passed to target disfavored political action. Representative King has stated that "[t]he bill sends a strong message that Texas stands with its friends." Clay Decl. at Ex. 4 (citing http://thekatynews.com/2017/04/21/house-unanimously-passes-hb-89-legislation-that-blocks-discriminatory-trade-practices-against-israel/). In Governor Abbott's official press release upon signing the bill he emphasized that "Anti-Israel Policies are anti-Texas policies." Clay Decl. at Ex. 3 (citing https://gov.texas.gov/news/post/anti-israel-policies-are-anti-texas-policies). Further, Mr. Abbott responded to a news report that the Act would be challenged in court by

tweeting "Texas stands with Israel. Period." Clay Decl. at Ex. 5 (citing

https://twitter.com/GregAbbott_TX/status/1074729761363120129).

## II.    The Act has harmed Plaintiffs.

### A.    John Pluecker

Plaintiff John Pluecker is a writer, artist, interpreter and translator.  Decl. of John

Pluecker at ¶ 3.  His work has appeared in literary journals in the U.S. and Mexico.  *Id.*  He has

translated numerous high-profile books from Spanish and has presented work in numerous art

institutions and universities.  *Id.*  As an interpreter and writer, Mr. Pluecker volunteers his time

and talents to various civil rights and immigrant rights organizations. *Id*. at ¶ 4.  He cares deeply

about ensuring that members of the public with limited English ability have language access to,

and involvement in, cultural and political movements.  *Id*.

Through his involvement in the art community and civil rights advocacy, Mr. Pluecker

has developed friendships with Palestinian artists and political activists and learned about the

Palestinian conflict with Israel.  *Id*. at ¶ 5.  He has family members and friends from the U.S.

who have worked on issues relating to the oppression of Palestinians, and he has developed a

sense of solidarity with Palestinian causes.  *Id.*  He is an active supporter of Palestinian rights

and liberation, and supports related art exhibits and presentations, including the annual Houston

Palestine Film Festival.  *Id.*  Mr. Pluecker has supported BDS campaigns and other nonviolent

strategies because he believes in attempts to promote justice and effectuate human rights in Israel

and the Palestinian territories.  *Id.* at ¶ 6.  Specifically, Mr. Pluecker participates in a BDS

boycott campaign against Sabra products to protest the company's support for a particularly

controversial section of the Israel Defense Forces ("IDF").  *Id.*  It would go against his political

and moral beliefs to go on record with or sign on to anything perceived to be an anti-BDS

statement. *Id.* Mr. Pluecker's participation in a BDS campaign is not motivated by economic self-interest. *Id.* at ¶ 7.

As a sole proprietor,[1] Mr. Pluecker's livelihood depends on providing services as a freelance writer, artist, interpreter, and translator. *Id*. at ¶ 8. For the past few years, he has contracted with the University of Houston ("UH"). *Id.* at ¶ 9. The contracts with UH represent an important source of income for Mr. Pluecker. *Id.*

In March of 2018, a representative of the Blaffer Art Museum at UH contacted Mr. Pluecker to request his services for the translation of an art essay. *Id*. at ¶ 10. Because of his prior relationship with UH, Mr. Pluecker agreed on a fixed fee and began work on the translation before he had reviewed or signed a formal contract with UH. *Id.* Upon reviewing the standard purchasing agreement for the translation, Mr. Pluecker noticed a new provision he had not seen in prior contracts from UH. *Id.* at ¶ 11, Ex. 1. The standard purchasing agreement contained a "No Boycott of Israel" certification provision that required Mr. Pluecker to certify that he does not boycott Israel and will not boycott Israel for the life of the contract. *Id.*

Mr. Pluecker was unwilling to sign the contract because he believed it violated his free speech rights. *Id*. at ¶ 14. Specifically, Mr. Pluecker did not want to forfeit his participation in a BDS boycott campaign against Sabra and his support of pro-Palestinian presentations and art exhibits, nor did he want to disavow his right to participate in BDS boycott campaigns in the future. *Id.* Mr. Pluecker could not have certified that he was not engaged in a boycott of Israel without ceasing to participate in political expression that is important to him. *Id.*

---

[1] The Texas Secretary of State website describes sole proprietorships as "the simplest form of business. . . . In a sole proprietorship, a single individual engages in a business activity without necessity of formal organization." Clay Decl. Ex. 6 (citing https://www.sos.state.tx.us/corp/businessstructure.shtml).

Accordingly, Mr. Pluecker did not sign the contract. *Id.* at ¶ 12. Instead, he crossed out the provision and initialed next to it to indicate his disapproval of that provision in the contract. *Id.* Mr. Pluecker then submitted that copy to UH. *Id.* at ¶ 12, Ex. 2. The representative of the Blaffer Art Museum asked a supervisor whether the contract with the redacted provision was acceptable, but was informed that Mr. Pluecker would have to complete the No Boycott of Israel certification. *Id.* at ¶ 13. Mr. Pluecker refused to sign the contract and was forced to forgo payment for the translation work that he had already begun. *Id.*

A few months later, in September of 2018, a faculty member of UH's Department of Modern and Classical Languages invited Mr. Pluecker to be a guest speaker and workshop leader to a class of college students for a fee of $250. *Id.* at ¶ 15. However, the speaker agreement form also included a "No Boycott of Israel" clause. *Id.* at ¶ 15, Ex. 3. Like the first contract, the second UH contract included a certification that Mr. Pluecker "does not boycott Israel" and "will not boycott Israel during the term of this Agreement." *Id.* Once again, Mr. Pluecker did not sign the second contract, because he objected to making the certification. *Id.* at ¶ 16. He responded to UH that he would not sign the second contract, because "it includes language that requires me to affirm that I am opposed to the boycott of the State of Israel." *Id.* at ¶ 16, Ex. 4. UH denied Mr. Pluecker the contract and the opportunity to be a guest speaker. *Id.* at ¶ 17.

**B.      Obinna Dennar**

Plaintiff Obinna Dennar is a graduate student who has contracted with public school districts to judge high school debate tournaments since 2015. Dennar Decl. at ¶ 3. Historically, Mr. Dennar has judged about 10 tournaments a year and used the income to pay for educational expenses. *Id.*

Mr. Dennar learned about the conflict between Israel and Palestine from a young age and considers himself an activist for Palestinian rights and liberation. *Id*. at ¶ 4. While an undergraduate at the University of Texas, Mr. Dennar attended meetings and demonstrations of a student organization called the Palestinian Solidarity Committee ("PSC"). *Id*. He is an active participant in BDS campaigns and shares the aforementioned goals of BDS campaigns. *Id.* Mr. Dennar participates in BDS campaigns because he opposes Israel's military actions with respect to Palestine and Palestinians. *Id.* Mr. Dennar believes that his protest is similar to that of those who called for divestment from South Africa in order to end apartheid. *Id.* Mr. Dennar's participation in a BDS campaign is not motivated by economic self-interest. *Id.*

In conjunction with BDS calls for boycott, Mr. Dennar boycotts consumer products offered by businesses that he believes support Israel's occupation of the Palestinian territories or that, directly or indirectly, economically benefit the Israeli government, including Sabra and L'Oreal. *Id*. at ¶ 5. Mr. Dennar participates in this boycott to protest what he believes are Israel's occupation of Palestinian lands, illegal settlements constructed on internationally recognized Palestinian territory, and violations of the human rights of Palestinians. *Id.* He would not boycott an Israeli company if that company stood against Israel's occupation of Palestinian territories and supported the plight of the Palestinian people, nor would he boycott an American company solely because its owner was of Israeli origin. *Id.* He has participated in the boycott of Israel since 2015 and has associated with others engaged in BDS campaigns. *Id.* Mr. Dennar is currently a member of the National Students for Justice in Palestine ("NSJP") and NSJP's Houston Chapter, SJP-Houston. His activities for NSJP and SJP-Houston include educational presentations, college tabling, and attending meetings relating to Palestinian justice. *Id.*

In 2017, Mr. Dennar contacted Klein High School's debate coordinator to serve as a judge for an upcoming debate tournament.  *Id*. at ¶ 6.  After being approved by the coordinator, Mr. Dennar drove from Austin to Houston to judge at the tournament.  *Id*.  There, Mr. Dennar was provided with an independent contractor agreement and told that he would need to sign it in order to be paid, but that he could sign it after he finished judging.  *Id*.  Assuming that the contract would be similar to ones he had signed in the past, Mr. Dennar waited until the end of the tournament to review the contract.  *Id*.  After the tournament, Mr. Dennar looked at the independent contractor agreement and noticed that it included a form titled "Certification Regarding Terrorist Organizations and Boycott of Israel," and specifically included the certification language required by the Act.  *Id*. at ¶ 7, Ex. 1.  Mr. Dennar had to sign the certification in order to be paid.  *Id*. at ¶ 7.  Mr. Dennar refused because he is engaged in a boycott of Israel and he does not want to disavow his boycott.  *Id*. at ¶ 8.  Because he never signed the Klein ISD contract and accompanying forms, he was never paid for his work.  *Id.*

In August of 2018, Mr. Dennar attempted to judge at a different debate tournament at another school.  Before he went to the tournament, Mr. Dennar was presented with a contract that again included the "No Boycott of Israel" language.  *Id*. at ¶ 9.  Mr. Dennar could not sign the contract, because he is engaged in a boycott of Israel, and thus lost out on the opportunity to judge at the tournament.  *Id.*  Because he now understands that all Texas public high schools are required to include the "No Boycott of Israel" certification, Mr. Dennar has been forced to forgo any contract work as a judge at public high school debate tournaments in the state.  *Id*. at ¶ 10.  Mr. Dennar objects to making the certification and does not want to go against his political beliefs by signing the certification.  *Id.*

### C.     Zachary Abdelhadi

Plaintiff Zachary Abdelhadi is a sophomore at Texas State University.  Abdelhadi Decl. at ¶ 3.  After high school, he anticipated judging about 15 debate tournaments a year for Lewisville ISD, representing an important source of income to pay for his college expenses.  *Id.* at ¶ 4.

Mr. Abdelhadi is Palestinian-American.  *Id.* at ¶ 5.  His father is from Palestine, and his mother was born in the U.S.  *Id.*  Through his father and older sister, Mr. Abdelhadi learned about the conflict between Israel and Palestine, and he considers himself an activist for Palestinian rights and liberation.  *Id.*  He actively participates in BDS campaigns because he agrees with their efforts to seek an end to the Israeli occupation of Palestinian homelands, equal rights for Arab-Palestinian citizens of Israel, and the right of return for Palestinians.  *Id.*  He learned about BDS through his family members who also participate in a BDS campaign.  Mr. Abdelhadi's participation in BDS is not motivated by economic self-interest.  *Id.*

In conjunction with BDS campaigns, Mr. Abdelhadi boycotts consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories.  *Id.* at ¶ 6.  Mr. Abdelhadi does not boycott all Israeli companies; he boycotts only those supporting Israel's occupation of Palestinian territories, those that support Israeli policies that oppress Palestinian people, or those supporting the IDF.  *Id.* at ¶ 7.  For example, Mr. Abdelhadi avoids using booking services such as VRBO that list vacation rental homes in Israeli settlements in the West Bank.  *Id.*  He also avoids purchasing PepsiCo, HP, and Strauss Group products as a result of their purported affiliation with and support for the IDF.  *Id.*  Mr. Abdelhadi participates in these boycott campaigns to protest both the occupation and the settlements, which he believes

violate the human rights of Palestinians. *Id*. at ¶ 8. He has engaged in these boycotts of Israel since 2012 and considers himself a participant in BDS campaigns. *Id.*

Soon after Mr. Abdelhadi graduated from high school, his former debate teacher offered him a chance to judge debate tournaments. *Id*. at ¶ 9. Mr. Abdelhadi expressed a desire to do so, knowing he could use the money from the tournaments to help pay for college expenses. *Id.*

In or around September 2017, Mr. Abdelhadi's former debate teacher sent him a contract for speech and debate judging, which included a "Not [sic] Boycott Israel" certification. *Id*. at ¶ 10, Ex. 1. The certification included the Act's definitions of "Boycott Israel" and "Company." *Id.* Mr. Abdelhadi was required to sign the contract to judge debate tournaments. *Id*. at ¶ 10. Mr. Abdelhadi's debate teacher, who knew his family was Palestinian and was aware of his political views, had noticed the anti-boycott form now being required by Lewisville ISD and told him that she knew he would not be happy about it when she emailed him the form. *Id*. at ¶ 11.

Mr. Abdelhadi refused to sign the certification and told his debate teacher that he could not sign it because he boycotts Israel. *Id*. at ¶ 12. Because of Mr. Abdelhadi's political beliefs and association with a BDS campaign, he was unable to secure debate tournament judging opportunities with the Lewisville ISD. *Id.* Mr. Abdelhadi has not signed the Lewisville ISD contract, because it would force him to discontinue his current and future participation in BDS campaigns. *Id*. at ¶ 13. Additionally, he objects to making the certification and does not want to contradict his political beliefs by signing the certification. *Id.* at ¶¶ 13-14.

**D.     George Hale**

George Hale is a radio reporter for KETR, the NPR station for northeast Texas, which is licensed to Texas A&M University-Commerce ("TAMUC"). Hale Decl. at ¶ 3. Mr. Hale is also the host and lead reporter of KETR's investigative radio series and podcast, "Buried." *Id*.

Unlike full-time staff members at KETR, who are employees of TAMUC, Mr. Hale has worked as a sole proprietor who independently contracts with TAMUC since joining the radio station. *Id*. at ¶ 4.

Mr. Hale joined KETR in 2016 after spending nearly eight years reporting on the Israeli-Palestinian conflict for various news agencies. *Id*. at ¶ 5. Overseas, he reported from Israel, the Palestinian territories, Egypt, and Jordan. From September 2008 to May 2016, he lived full-time in Bethlehem, an ancient city located entirely within the Israeli-occupied West Bank and under the control of the Palestinian Authority. *Id.*

Coupled with his academic and journalistic work, Mr. Hale's experience of living with Palestinians in Bethlehem shaped his political beliefs relating to the Israeli-Palestinian conflict. *Id*. at ¶ 6. Despite having lived within the internationally recognized Palestinian territory, Mr. Hale had to go through checkpoints and roadblocks operated by Israeli security forces just to travel in and out of Bethlehem. *Id.* Upon entering and exiting Israel, Mr. Hale was subjected to numerous strip searches and prolonged questioning about his work. *Id.* He was exposed to tear gas in his apartment and car from Israeli forces on a regular basis. *Id.* These dehumanizing experiences helped him to understand the complaints of Palestinian about living under Israeli military control. *Id.* Mr. Hale considers himself to be politically aligned with the Palestinian people and supports their struggle for liberation. *Id.* Mr. Hale does not support violence against civilians as a means to achieve that outcome. *Id.* For this reason, he generally agrees with and supports non-violent, Palestinian-led BDS campaigns. *Id.*

Mr. Hale maintains professional relationships and personal friendships with journalists who are pro-Israel, pro-Palestine, Israeli citizens, and Palestinian citizens, some of whom participate in BDS campaigns. *Id*. at ¶ 8. Mr. Hale is also on mailing lists with pro-Palestinian

groups and has previously made the conscious choice to avoid purchasing certain products originating from areas controlled by Israel.  *Id.*  In solidarity with BDS campaigns and Palestinians in general, Mr. Hale has previously boycotted consumer goods offered by businesses supporting Israel's occupation of the Palestinian territories.  *Id*. at ¶ 9.  For example, when buying gifts, he chose alternatives to Israel's popular Dead Sea cosmetics company, Ahava, because some of its operations are conducted in the West Bank.  *Id.*  He also avoided buying HP products due to Mr. Hale's understanding of its role in the ID system that Israel uses to control the movement of Palestinians.  *Id.*  Mr. Hale supported this boycott to protest both the Israeli occupation of the Palestinian territories and the settlements, which he believes violate the human rights of Palestinians.  *Id.*  Mr. Hale generally agrees with and supports the goals of BDS campaigns, including their call for an end to the Israeli occupation of the Palestinian territories, equal rights and respect for human rights for Israeli Arabs, and the right of return for Palestinian refugees.  *Id*. at ¶ 7.

In February of 2018, TAMUC contracted with Mr. Hale to provide the KETR general manager with edited, ready-for-air audio cut segments of the Buried podcast series.  *Id*. at ¶ 11. The contract appeared to be a standard Services Agreement from TAMUC, but it contained a provision that had not appeared in prior TAMUC contracts for Mr. Hale—namely, a "Contractor Certification Regarding Boycotting Israel."  *Id*. at ¶ 11, Ex. 1.  Knowing Mr. Hale's political inclinations, the station's general manager told Mr. Hale that he was aware Mr. Hale would not like one of the provisions.  *Id*. at ¶ 12.  Mr. Hale made it clear to his general manager that he did not approve of the certification provision and questioned why it was included.  *Id.*  However, because Mr. Hale had begun his work on the Buried podcast in September 2017 and he was still

committed to the ongoing investigative project, he did not feel that he could quit midway through his work. *Id.* He therefore signed the contract. *Id.*

For months afterward, Mr. Hale's discomfort from signing a contract with a "No Boycott of Israel" provision grew. *Id*. at ¶ 13. He felt a moral conflict with how the "No Boycott of Israel" certification limited what he could say and do, and with whom he could associate. *Id.* Mr. Hale was upset that he was forced to disavow and effectively discontinue his boycott. *Id.* Further, Mr. Hale felt very uncomfortable with the idea that the State of Texas would require other public radio journalists to disavow protected expression and association related to the Israeli-Palestinian conflict, based simply on Texas's hostility to expression and expressive conduct supporting Palestinian rights. *Id.*

In July of 2018, Mr. Hale became aware that his contract was about to come up for renewal. Prior to viewing the renewal contract, Mr. Hale expressed concerns about signing another contract with a "No Boycott of Israel" certification. *Id*. at ¶ 14. When presented with a portion of the revised contract in early September of 2018, Mr. Hale requested that the clause be removed from the Services Agreement because it violated his rights to free speech and free association. *Id*. at ¶ 15. A representative of TAMUC rejected this request on the basis that the certification provision was a requirement of the State of Texas. *Id.*

Wishing to memorialize his disapproval of the certification requirement, Mr. Hale attempted to sign the contract under protest and indicated so in a notation on the signed copy he submitted on October 9, 2018. *Id*. at ¶ 16, Ex. 2. After Mr. Hale's supervisor submitted the contract to TAMUC's Assistant Director of Procurement Services, who swiftly rejected Mr. Hale's notation and stated, "He can sign a clean copy or he won't work. We are not forcing him to sign under duress or protest." *Id*. at ¶ 17, Ex. 3.

Faced with the bleak prospect of losing his job, Mr. Hale had no choice but to sign the contract in order to complete his commitments and earn a living. *Id.* at ¶ 18. Mr. Hale signed the TAMUC contract on October 10, 2018, despite his clear and known objection to making the certification. *Id*. at ¶ 18, Ex. 4. As a result, Mr. Hale has been forced to disavow and cease his boycott participation. *Id*. at ¶¶ 10, 13, 19. Because Mr. Hale cannot be sure what the State of Texas considers a proscribed boycott of Israel, he is afraid to speak out in favor of BDS or associate with persons engaged in BDS. *Id.* at ¶¶ 21, 22.

## ARGUMENT

To obtain a preliminary injunction the movant must show:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). All four factors are met here. Indeed, two federal district courts recently preliminarily enjoined nearly identical laws after finding that each of the four factors was satisfied. *See Koontz*, 283 F. Supp. 3d 1007; *Jordahl*, 336 F. Supp. 3d 1016.

Plaintiffs have a substantial likelihood of demonstrating that the Act violates the First and Fourteenth Amendment by infringing on their right to engage in political boycotts, by discriminating on the basis of content and viewpoint, by impermissibly compelling speech, and because the Act is impermissibly vague. The violation of Plaintiffs' constitutional rights constitutes irreparable injury that outweighs any supposed harm to the State because the State does not have an interest in enforcing an unconstitutional law, and the public interest is best served by enjoining an unconstitutional law.

# I. Plaintiffs are likely to prevail on the merits

## A. The Act unconstitutionally conditions contract work on the sacrifice of First Amendment rights

### 1. Political boycotts are protected under the First Amendment

Political boycotts, including political boycotts of Israel, are protected by the First Amendment. In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the Supreme Court considered a lawsuit attempting to impose liability on participants in an NAACP-organized boycott of white merchants in Port Gibson, Mississippi, which was part of an effort to achieve racial equality and integration. *Id.* at 889. The Court held that the boycott, and activities associated with the boycott, were protected under the First Amendment. *Id.* at 911, 915. In so holding, the Court acknowledged the state's power to regulate economic activity, but distinguished the regulation of economic boycotts and political boycotts: "While States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." *Id.* at 913. Thus, the Court concluded that "the right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change . . . ." *Id.* at 914.

The Court approvingly quoted the Fifth Circuit's opinion in *Henry v. National Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979), a collateral opinion which also considered the boycott at issue in *Claiborne*:

> There is no suggestion that the NAACP, MAP or the individual defendants were in competition with the white businesses or that the boycott arose from parochial economic interests. On the contrary, the boycott grew out of a racial dispute with the white merchants and city government of Port Gibson and all of the picketing, speeches, and other communication associated with the boycott were directed to the elimination of racial discrimination in the town.

> This differentiates this case from a boycott organized for economic ends, for speech to protest racial discrimination is essential political speech lying at the core of the First Amendment.

*Claiborne*, 458 U.S. at 915 (quoting *Henry*, 595 F.2d at 303).

      *Claiborne* and *Henry* make clear that where boycotts are aimed at political change and not enacted for self-interested economic purposes, they are protected by the First Amendment. That principle has been affirmed repeatedly by the Supreme Court. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 508 (1988) (distinguishing *Claiborne* because "the boycott in *Claiborne* was not motivated by any desire to lessen competition or to reap economic benefits but by the aim of vindicating rights of equality and freedom lying at the heart of the Constitution"); *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990) (distinguishing *Claiborne* because "[t]hose who joined the Claiborne Hardware boycott sought no special advantage for themselves. . . . They sought only the equal respect and equal treatment to which they were constitutionally entitled.").

      The principle established in *Claiborne* protects the rights of Plaintiffs to boycott Israel. Political boycotts of Israel are motivated by the desire to "vindicat[e] rights of equality and freedom" for Palestinians, and are "designed to force governmental and economic change." *Claiborne*, 458 U.S. at 914-15; Pluecker Decl. at ¶¶ 6-7; Dennar Decl. at ¶ 4; Abdelhadi Decl. at ¶¶ 5 and 8; Hale Decl. at ¶¶ 6-7. Further, participants in such boycott campaigns are not motivated "by any desire to lessen competition or to reap economic benefits." *Allied Tube*, 486 U.S. at 508; Pluecker Decl. at ¶ 7; Dennar Decl. at ¶ 4; Abdelhadi Decl. at ¶¶ 5-8.

      The First Amendment's protection of political boycotts of Israel has been affirmed by both courts that have recently considered laws nearly identical to the one here and granted

preliminary injunctions.  In *Jordahl v. Brnovich*, the Arizona District Court analyzed a similar boycott provision, and concluded that:

> [W]hen a statute requires a company, in exchange for a government contract, to promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes, the state is infringing on the very kind of expressive conduct at issue in *Claiborne*. Such a regulation squarely raises First Amendment concerns. Indeed, reasoning otherwise would completely undermine the First Amendment's long-held precedents protecting First Amendment rights to assemble so that citizens of this Country can collectively "secure compliance" with their political demands.

336 F. Supp. At 1042); *see also id.* ("In accordance with *Claiborne*, these types of boycotting activities [prohibited under the law], which clearly include 'the practice of persons sharing common views banding together to achieve a common end,' are entitled constitutional protections.") (quoting *Claiborne*, 458 U.S. at 907).

Similarly, in *Koontz v. Watson*, the Kansas District Court examined a law that "required all contractors to certify that they are not engaging in a boycott of Israel."  283 F. Supp. 3d at 1013.  The court held that the activity this law sought to regulate was protected First Amendment activity:

> The conduct prohibited by the Kansas Law is protected for the same reason as the boycotters' conduct in *Claiborne* was protected. [Plaintiff] and others have "banded together" to express, collectively, their dissatisfaction with Israel and to influence governmental action. Namely, its organizers have banded together to express collectively their dissatisfaction with the injustice and violence they perceive, as experienced both by Palestinians and Israeli citizens. She and others participating in this boycott of Israel seek to amplify their voices to influence change, as did the boycotters in *Claiborne*. The court concludes that plaintiff has carried her burden on the current motion to establish that she and others are engaged in protected activity.

*Id.* at 1022.

Finally, if there were any doubt that the boycotts targeted by the Act are political in nature, the statutory definition of "Boycott Israel" makes it clear by explicitly excluding refusals

to deal for "ordinary business purposes." Tex. Gov't Code § 808.001(1). In other words, if a

company refuses to do business with Israel or with a person or entity doing business in Israel or

in an Israeli-controlled territory based on its beliefs about Israeli politics or ethics, such an action

is prohibited. But if a company makes the same decision for business reasons, such an action is

permissible under the Act.[2] Thus, the Act's text makes clear that it specifically aims to regulate

politically motivated activity, which infringes on the First Amendment.

> **2.  The State may not force Plaintiffs to choose between their First Amendment rights and contract work.**

Under the Act, any company that contracts with a State entity must sacrifice its First

Amendment rights to engage in a political boycott of Israel. Tex. Gov't Code § 2270.002. The

Constitution does not permit conditioning public employment, including contract work, on the

sacrifice of First Amendment rights. "Our modern 'unconstitutional conditions' doctrine holds

that the government 'may not deny a benefit to a person on a basis that infringes his

constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit."

*Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (citing

*Perry v. Sindermann,* 408 U.S. 593, 597 (1972)). "[T]he theory that public employment which

may be denied altogether may be subjected to any conditions, regardless of how unreasonable,

has been uniformly rejected." *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S.

589, 605–06 (1967).[3]

---

[2] As discussed further below, what exactly constitutes "ordinary business purposes" under the Act is not defined, and the limits of this exception are impermissibly vague.

[3] *See also Legal Services Corp. v. Velazquez,* 531 U.S. 533, 548–49 (2001) ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.").

This is equally true for independent contractors.  *Umbehr*, 518 U.S. at 674; *Perry*, 408 U.S. at 597 (the prohibition of unconstitutional conditions on speech applies "regardless of the public employee's contractual or other claim to a job").  In the Fifth Circuit, "it is settled [law] . . . that government contractors are entitled to the same First Amendment protections as other citizens, and the government's procurement role does not entitle it to compel speech as the price of maintaining eligibility to perform government contracts."  *Associated Builders & Contractors of Se. Texas v. Rung*, 1:16-CV-425, 2016 WL 8188655, at *11 (E.D. Tex. Oct. 24, 2016) (citing *Oscar Renda Contracting, Inc. v. City of Lubbock, Tex.*, 463 F.3d 378 (5th Cir. 2006)).  This includes independent contractors who have no prior relationship with the government agency. *Oscar Renda Contracting, Inc.*, 463 F.3d at 386.

Because the Act conditions contracting work on the sacrifice of First Amendment rights, and is applied broadly and prospectively to all contractors, the State bears a heavy burden of demonstrating that the Act's necessity to curing a real harm to the actual operation of public services outweighs its infringement on speech.  The State cannot meet that burden here.

In the Fifth Circuit, when the State makes a single adverse employment decision that infringes on First Amendment rights, courts ordinarily employ the test established in *Pickering v. Bd. of Edu.*, 391 U.S. 563 (1968), to determine whether such an action passes constitutional muster.  The *Pickering* test balances "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees."  *Id.* at 568.

Under this test, a public contractor retains the right to speak as a citizen on matters of public concern, yet that is precisely what the Act prohibits.  The expression prohibited by the Act—expression regarding the conflict between Israel and Palestine, and the human rights of

Palestinians—is expression on a matter of public concern. Expression "involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)); *see also Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir. 2001). As the *Jordahl* court found when it granted a preliminary injunction against a nearly identical statute in Arizona, "actions taken by Israel in relation to Palestine are matters of much political and public debate. Plaintiffs want to participate in collective economic boycotts of goods and products from companies doing business in Israeli-occupied settlements in order to show their political discontent with Israel's policies toward Palestine." *Jordahl*, 336 F. Supp. 3d at 1048; *see also Koontz*, 283 F. Supp. 3d at 1022. Indeed, the boycotts proscribed by laws like those in Arizona, Kansas, and Texas are not merely expression on a matter of public concern, they are a form of "political speech lying at the core of the First Amendment." *Claiborne*, 458 U.S. at 915 (quoting *Henry*, 595 F.2d at 303) (internal quotation marks omitted).

Under *Pickering*, government regulation of protected employee or contractor speech is proper only if "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee or contractor], as a citizen, in commenting upon matters of public concern." 391 U.S. at 568. Accordingly, the Fifth Circuit has held that under the *Pickering* test, the government interest in constraining speech must relate to the governments' interest in providing services efficiently:

> [T]he State's amorphous interest in protecting its interests is not the sort which
> may outweigh the free speech rights of state employees under *Pickering*. . . .
> Indeed, the only state interest acknowledged by *Pickering* and its progeny,
> which may outweigh the right of state employees to speak on matters of public

> concern, is the State's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees."

*Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998); *see also Kinney v. Weaver*, 367 F.3d 337, 362 (5th Cir. 2004) (en banc) (the relevant issue is not merely "the weight of the governmental interest considered in abstract terms;" instead what matters is "how the speech at issue *affects* the government's interest in providing services efficiently") (emphasis in original).

Where a law preemptively affects the speech of an untold number of employees, courts find that the First Amendment implications are even more serious. The Supreme Court has categorized requests of the government "to apply *Pickering* to Congress' wholesale deterrent to a broad category of expression by a massive number of potential speakers," as a "sweeping statutory impediment to speech," which "gives rise to far more serious concerns than could any single supervisory decision." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 467-68 (1995) ("*NTEU*"). Accordingly, the adjustments made to the level of scrutiny in these contexts amounts to "a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus v. Am. Fed'n of State, County, & Mun. Employees, Council 31,* 138 S. Ct. 2448, 2472 (2018).

This means that the State bears a much heavier burden than it would in an ordinary public-employee speech case. *NTEU*, 513 U.S. at 468; *see also Jordahl*, 336 F. Supp. 3d at 1045 ("The State's burden in justifying a restriction of speech or expressive conduct is greater, however, when the restriction is not related to an isolated employee disciplinary action but instead has widespread prophylactic impact."). The State "must show that the interests of both potential audiences and a vast group of present and future [contractors] in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at

571).  To make this showing, the State "must do more than simply 'posit the existence of the disease sought to be cured.' . . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Id.* at 475 (omission in original) (citation omitted).

Here, the State cannot meet this heavy burden.  The State has no interest that can outweigh such a sweeping restriction on speech, much less one grounded in "promoting the efficiency of the public services it performs through [Plaintiffs' contracted work]."  *Hoover*, 164 F.3d at 226.  The speech targeted by the Act is wholly unrelated to the contracting activities Plaintiffs seek to perform.  There is no reason that participation in a boycott against Israel makes an individual any less capable of translating an art essay, judging a high school debate tournament, or producing a podcast.[4]  *See Jordahl*, 336 F. Supp. 3d at 1047 ("The prohibited acts also have no relation to official contractors' duties in general."); *see also* Dennar Decl. at ¶ 14; Abdelhadi Decl. at ¶ 16.  The State cannot meet its burden of demonstrating that the Act is necessary to counter a real, material harm to the State's ability to perform its public services effectively.  Therefore, the Act is unconstitutional.

## B.    The Act Impermissibly Suppresses Political Boycotts of Israel Based on their Content and Viewpoint.

The First Amendment ensures that the government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v.*

---

[4] Further, even if this Court were to consider a broader category of government interests, such interests could not pass exacting scrutiny for the reasons set forth in Section II B.  Moreover, the legislative finding that the economic impact of the Act was "indeterminate" makes clear that the Act was not passed to address some economic need of the state. Clay Decl. at Ex. 7 (https://capitol.texas.gov/tlodocs/85R/fiscalnotes/pdf/HB00089E.pdf#navpanes=0).  *Cf. Jordahl,* 2018 WL 4732493, at *16 (expressing skepticism regarding State interest of economic benefit where legislative finding revealed no anticipated fiscal impact).

*Mosley*, 408 U.S. 92, 95 (1972). As such, content-based regulations, those which "target speech based on its communicative content," are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat. Inst. Of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). Viewpoint discrimination is an "egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of VA*, 515 U.S. 819, 829 (1995) (holding unconstitutional a state university's denial of funds for printing costs of a newspaper with a Christian viewpoint).[5]

The Act falls squarely into the prohibition against content-based and viewpoint-based discrimination. On its face, it punishes a particular category of speech: political boycotts of Israel. The law exempts from its purview boycotts on other topics, *e.g.* against other nations or for other reasons. Most glaringly, the Act allows contractors who boycott Palestinian companies or companies that engage in reverse boycotts of BDS participants to continue to contract with the State. Under the Act, only contractors who do not share the State's declared position on the Israel-Palestine political controversy are denied the opportunity to contract with the State.

---

[5] The prohibition against content and viewpoint discrimination applies equally to corporate speech. *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 533–34 (1980) ("[W]e [have] rejected the contention that a State may confine corporate speech to specified issues. . . . [T]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.") (citation and internal quotation marks omitted).

The history of the Act makes clear it was enacted precisely "because of disagreement with the message [BDS] conveys." *Reed v. Town of Gilbert, Ariz.,* 135 S. Ct. 2218, 2227 (2015). The Act's Sponsor, Representative King, referred to the Act as "the anti-BDS bill," and characterized the BDS campaigns as "economic warfare." Clay Decl. at Ex. 2. Upon passage of the bill, Governor Abbott stated in the State's official press release that: "[a]nti-Israel policies are anti-Texas policies, and we will not tolerate such actions against an important ally." Clay Decl. at Ex. 3. Further, Governor Abbott responded to a news report that the Act would be challenged in court by tweeting "Texas stands with Israel. Period." Clay Decl. at Ex. 5.

Because the Act discriminates on the basis of content and viewpoint, it must pass strict scrutiny. *Reed*, 135 S. Ct. at 2231. "A regulation is narrowly tailored when it does not burden substantially more speech than is necessary to further the government's legitimate interests." *Horton v. City of Houston, Tex.*, 179 F.3d 188, 194 (5th Cir. 1999) (internal quotations omitted)).

It cannot survive such stringent review. Initially, the Act does not serve a substantial government purpose. The Act was passed to support Israel by punishing opposing viewpoints. In the State's press release, Abbott declared: "As Israel's number one trading partner in the United States, Texas is proud to reaffirm its support for the people of Israel and we will continue to build on our historic partnership." Clay Decl. at Ex. 3. The Act is an unflinchingly political statement in support of Israel. But enacting legislation that purports to support an allied nation by prohibiting protest against that nation is not a permissible government aim. *Cf. Boos v. Barry*, 485 U.S. 312, 322 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment. . . . We are not persuaded that the differences between foreign officials and American citizens require us to deviate from

these principles here." (citations and internal quotation marks omitted)).  As the Kansas District

Court found in striking down the nearly identical law in *Koontz*: "The Kansas Law's legislative

history reveals that its goal is to undermine the message of those participating in a boycott of

Israel. This is either viewpoint discrimination against the opinion that Israel mistreats

Palestinians or subject matter discrimination on the topic of Israel. Both are impermissible goals

under the First Amendment."  *Koontz*, 283 F. Supp. 3d at 1022.

Even if supporting a foreign government were considered a substantial government

purpose, the Act is not narrowly tailored to that interest.  As noted above, the law is in no way

limited to contractors whose boycott activity implicates state interests.  The Act is also

dramatically underinclusive because there are numerous ways that Texas could support Israel

without burdening speech, such as by (1) purchasing goods from Israeli companies for use by the

State's employees or (2) entering into cooperative agreements on areas of shared interest.

*Koontz*, 283 F. Supp. 3d at 1023.  Further, the Act is fatally overinclusive because it applies to

political boycotts.  *Id.*; *Jordahl*, 336 F. Supp. 3d at 1049.  Because the Act burdens more speech

than necessary, it fails the strict scrutiny required by the First Amendment.  *Horton*, 179 F.3d at

194.

The State also may argue the compelling interest at issue is stamping out economic

discrimination based on nationality.  But, even assuming the legitimacy of this stated interest, the

Act is wildly underinclusive because it permits discrimination on the basis of nationality for

*every other country* except Israel, including the nationality of individuals in Palestinian

territories that are not under Israeli control.  Additionally, the law is over-inclusive because it

prohibits contractors from declining to do business with Israeli or international companies that

support the Israeli government and the occupation of the Palestinian territories, for political, not

discriminatory, reasons. Not one of the Plaintiffs is engaged in a boycott for discriminatory reasons. For instance, Mr. Abdelhadi does not boycott every Israeli company. Rather, he boycotts only those companies that support Israel's occupation of Palestinian territories, support Israeli policies that oppress Palestinian people, or support the IDF. Abdelhadi Decl. at ¶ 7. As such, the law is not narrowly tailored, and fails strict scrutiny.

**C.     The Act compels speech in violation of the First Amendment.**

The First Amendment prohibition against Congress making a law that "abridg[es] the freedom of speech" protects both the right to speak and the right to refrain from speaking. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

In accordance with this principle, courts have consistently struck down government attempts to compel speech on controversial issues. For example, in *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971), the Supreme Court held that the First Amendment prohibits the state bar from requiring an applicant "to state whether she had ever been a member of the Communist Party or any organization 'that advocates the overthrow of the United States Government by force or violence." *Id.* at 4-5. The Court explained: "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas, as Arizona has engaged in here, discourage citizens from exercising rights protected by the Constitution." *Id.* at 6. Accordingly, when a state inquires into these protected areas, "a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Id*. at 6-7. "And whatever justification may be

offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Id*. at 7.

The same principle applies to conditions imposed on government employment and government contracts. Public "[e]mployment may not be conditioned on an oath denying past, or abjuring future, associational activities within constitutional protection." *Cole v. Richardson*, 405 U.S. 676, 680 (1972). "Nor may employment be conditioned on an oath that one has not engaged, or will not engage, in protected speech activities." *Id.; see also Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 133 S. Ct. 2321, 2330 (2013) (holding that domestic organizations were likely to succeed in their challenge to a federal statutory provision requiring federal funding recipients to adopt a policy expressly opposing prostitution).[6]

Here, the Act compels contractors to reveal whether they boycott Israel for the impermissible purpose of punishing a disfavored belief. Those who reveal their participation in boycott activities against Israel are punished by being denied state contracts. Further, even those who are not actively engaged in BDS campaigns are compelled to take a public stance on one side of a contentious political issue. For example, Mr. Hale is sympathetic to the Palestinian cause and may wish to engage in boycotts in the future. Hale Decl. at ¶¶ 6-9, 19. However, the Act forces Mr. Hale to verify in public documents that he has not engaged in boycott activity—a declaration that Mr. Hale does not wish to make. *See* Hale Decl. at ¶ 21 (noting that he was not comfortable in signing a "No Boycott" certification because he did not want to publicly align

---

[6] *See also Umbehr*, 518 U.S. at 674–75 (holding that government contractors' free expression rights are entitled to the same First Amendment protection as that received by government employees) ("We have held that government workers are constitutionally protected from dismissal for refusing to take an oath regarding their political affiliation." (citations omitted)); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996) (holding that government contractors' political beliefs and associations are entitled to the same First Amendment protection as that received by government employees).

himself against those boycotting).  Further, Mr. Hale believes that signing the document forces

him to take a public position that is contrary to his own political beliefs on an issue about which

he cares deeply.  *Id.*  The Act's "unprecedented requirement . . . thus compels contractors to

engage in public speech on matters of considerable controversy adversely affecting their public

reputations and thereby infringing on the contractors' rights under the First Amendment."

*Associated Builders & Contractors of Southeast Texas*, 2016 WL 8188655, at *9; *see also Nat'l*

*Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 371 (D.C. Cir. 2014), *adhered to on reh'g*, 800 F.3d 518

(D.C. Cir. 2015))

The State has no legitimate interest in compelling speech on this subject because

Plaintiffs' participation or lack thereof in boycotts of Israel are unrelated to their ability to

perform contracting work for the State.  Compelled speech on matters wholly unrelated to the

performance of job duties violates the First Amendment.  *See Nat'l Ass'n of Mfrs.*, 748 F.3d at

371 (holding that compelled disclosure regarding whether certain products and minerals were

conflict free constituted compelled speech in violation of the First Amendment because the

regulation did not narrowly or reasonably "fit" the asserted government interest); *see also*

*Robinson v. Reed*, 566 F.2d 911 (5th Cir. 1978) (per curiam) (observing that compelled

disclosures about a plaintiff's personal life which were unrelated to her employment would not

withstand constitutional scrutiny).  Because the Act compels speech on matters of controversy

that are unrelated to the work performed by public contractors, it violates the Constitution.

### D.      The Act is impermissibly vague

"[A] statute which either forbids or requires the doing of an act in terms so vague that

men of common intelligence must necessarily guess at its meaning and differ as to its application

violates the first essential of due process of law."  *Cramp v. Bd. of Pub. Instruction of Orange*

*County, Fla.*, 368 U.S. 278, 287 (1961) (citation omitted); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.").

As applied to statutes that are "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 556, 573 (1974). This is because "First Amendment freedoms need breathing space to survive, [so the] government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963) (citations omitted); *Cramp*, 368 U.S. at 287 ("The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution.").

The Legislature passed the Act with the impermissible goal of discriminating against a particular viewpoint—namely pro-Palestinian or anti-Israeli political boycotts. But in their effort to capture as much disfavored speech as possible, they crafted a law that is so vague that an ordinary person cannot determine which of their actions fall under the boycott and which do not.

The Act defines "Boycott Israel" as "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relationships specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory, but does not include an action made for ordinary business purposes." Tex. Gov. Code. § 808.001(1). Included within this vast definition is a prohibition against "any action that is intended to penalize [or] inflict economic harm on. . . Israel or [any] person or entity doing business in Israel." *Id.* It is unclear what conduct this encompasses, especially given the degree of turmoil surrounding the Israel-Palestine conflict.

Conceivably any pro-Palestinian action, such as donating to a Palestinian organization, purchasing an entrance ticket to a Palestinian film festival, or purchasing art at a Gaza liberation fair, could be considered an action intended to "penalize" Israel. *See* Pluecker Decl. at ¶ 19. Would donating to an organization that organizes BDS campaigns, such as Jewish Voice for Peace, be considered an action to penalize entities doing business with Israel? How about picketing outside a Best Buy urging people not to purchase Hewlett-Packard products because of the company's dealings with the IDF? Even non-commercial actions, such as advocating for Palestinian rights or identifying alleged human rights abuses by the IDF, could fall under "any action" that is intended to penalize Israel, because it could conceivably cause someone else to stop buying products from companies that support the Israeli government.

Nor is it clear how any outside enforcement agency could possibly determine whether an action was "intended" to penalize or inflict economic harm on Israel. The Act provides no threshold for what constitutes "economic harm," so it is conceivable that the decision not to purchase a two-dollar product, such as one cup of Sabra Hummus, could fall under the Act's prohibitions, if the contractor is perceived to have a political motivation for its purchasing decision. Thus, it is apparent that the Act's primary purpose is not to regulate economic transactions, but rather to chill contractors from communicating any message of protest against the Israeli government.

The Act's exemption further exacerbates its vagueness, and demonstrates its illegitimate purpose. The Act excludes from its vast purview any action taken for "ordinary business purposes." The Act does not define the phrase "ordinary business purposes," and the term is not defined in Texas case law. A person of ordinary intelligence will not be able to ascertain when it is permissible to not do business with a company that happens to do business in Israel or be an

Israeli company. For instance, Coca-Cola sells its product in Israel. Clay Decl. at Exh 8 (citing https://www.coca-colacompany.com/stories/coca-cola-in-israel-innovation-with-a-creative-edge). Is a restaurant permitted to switch over to Dr. Pepper because its owner simply prefers the taste of Dr. Pepper? Is personal taste an "ordinary business purpose"? Or can the owner switch to an organic soft drink because she thinks it is more ethical to purchase organic goods? Does the fact that the decision is ethically based, even though it is unrelated to the Israeli-Palestine conflict, mean that such conduct would be prohibited? One plausible reading of the Act is that contractors *must* purchase products from companies that do business in Israel if they cannot come up with an economic justification for not doing so. After all, the Act prohibits "refusing to deal with or terminating business activities with . . . a person or entity doing business in Israel." *Id.* at §808.001(1). In practice, of course, the State will not audit the purchasing decisions of every contractor in Texas. But it is more likely to audit the purchasing decisions of contractors that vocally criticize the Israeli government or speak up in support of Palestinian rights. This susceptibility to selective enforcement is the signature vice of a vague statute.

The vagueness of the laws in question is not theoretical. For instance, Plaintiff Hale has in the past attempted to avoid purchasing products that are manufactured in the contested Palestinian territories. Hale Decl. at ¶ 9. Although Mr. Hale has not been confronted with that choice since signing his contracts, he is now unsure whether he could permissibly decline to purchase an HP product if given the option, or if, by signing his certification, he is now obliged to make the purchase unless he can justify not doing so for business purposes. *Id.* at ¶ 20. Additionally, Mr. Hale fears that his current affiliations with individuals and activists who support BDS campaigns or Palestinian rights could be perceived as participation in proscribed

boycotts, thus violating his certification. *Id.* at ¶ 21. Similarly, Plaintiff Pluecker, who did not

sign the No Boycott Clause, has attended numerous events sponsored by organizations that

support the Palestinian cause. Pluecker Decl. at ¶ 19. The purchases and donations he has made

at those events may be used to support BDS campaigns. *Id.* Mr. Pluecker is not certain whether

those actions constitute "action that is intended to penalize . . . Israel" or not, nor is there

guidance about whether such contributions would fall under this rubric. *Id.*

The expansive definition of "Boycott Israel" combined with its nebulous and undefined

exception, renders the law's boundaries unknowable to a person of ordinary intelligence.

Therefore, it is impermissibly vague.

## II.     Plaintiffs will continue to suffer irreparable harm absent a preliminary injunction

Plaintiffs have suffered and will continue to suffer irreparable harm absent a preliminary

injunction. Because Plaintiffs have demonstrated the violation of their First Amendment rights,

they have satisfied the irreparable harm inquiry. *Opulent Life Church v. City of Holly Springs,*

*Miss.*, 697 F.3d 279, 295 (5th Cir. 2012); *Deerfield Medical Center v. City of Deerfield Beach*,

661 F.2d 328, 338 (5th Cir. 1981). In *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court

held that a rule requiring sheriff's office employees to choose between their jobs and adherence

to the political party of their choice imposed irreparable harm, even though the employees could

later receive back pay in the event their suit was successful. *Id.* at 373. The Court explained that

"[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Id.*

As in *Elrod*, Plaintiffs' irreparable harm "stems . . . from the plainly unconstitutional

choice the [Texas] Law forces [them] to make: [they] either can contract with the state or [they]

can support a boycott of Israel." *Koontz*, 283 F. Supp. 3d at 1026. That injury is not conjectural

or speculative—the unconstitutional choice is already being forced on Plaintiffs, and countless other government contractors throughout Texas.  This harm is also ongoing. Unless and until a preliminary injunction issues, Plaintiffs will be forced to choose whether to forfeit their First Amendment rights or the opportunity to work for the State.  In addition to foregoing two contracts, Mr. Pluecker continues to lose out on contract work with the University of Houston because he will not sacrifice his First Amendment rights to obtain such work.  Pluecker Decl. at ¶¶ 10-18.  Similarly, Mr. Dennar and Mr. Abdelhadi continue to be deprived of the opportunity to earn money by judging debate tournaments.  Dennar Decl. at ¶¶ 6-12; Abdelhadi Decl. at ¶¶ 10-13.  While Mr. Hale continues to perform his job, the continuation of his contract is contingent on his relinquishing his First Amendment right to boycott Israel.  Hale Decl. at ¶¶ 17-18.  The Act thus continuously operates to chill Plaintiffs' and other contractors' speech rights. *Koontz*, 283 F. Supp. 3d at 1026.

## III.   The balance of equities weighs heavily in Plaintiffs' favor.

As the Fifth Circuit has held, the balance of equities between a plaintiff's constitutional right and the State's interest in enforcing an unconstitutional law weighs heavily in favor of preserving constitutional rights.  The plaintiffs' injuries outweigh any harm to the State because the State "can never have a legitimate interest in administering [a regulation] in a manner that violates federal law."  *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017).  Here too, because the State does not have a legitimate interest in enforcing an unconstitutional law, the First Amendment injuries suffered by Plaintiffs and all others subject to HB 89 weighs in favor of issuing a preliminary injunction.

**IV.     The public interest will be served by issuing a preliminary injunction.**

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Com'n,* 732 F.3d 535, 539 (5th Cir. 2013) (citation omitted); *see also Opulent Life Church v. City of Holly Springs, Miss.,* 697 F.3d 279, 298 (5th Cir. 2012); *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("Having determined that Mr. Homans has demonstrated a substantial likelihood of success on the merits, we believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression."). In contrast, the public interest is not served by continued enforcement of an unconstitutional law.

**Conclusion**

For the foregoing reasons, Plaintiffs request that this Court enter a preliminary injunction, prohibiting the enforcement of the Act.

Respectfully submitted,

*/s/ Edgar Saldivar*
Edgar Saldivar, TX Bar No. 24038188
Thomas Buser-Clancy, TX Bar No. 24078344
Andre Segura, TX Bar No. 24107112**
Adriana Piñon, TX Bar No. 24089768
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 325-7011
Fax: (713) 942-8966
esaldivar@aclutx.org
tbuser-clancy@aclutx.org
asegura@aclutx.org
apinon@aclutx.org

Brian Hauss**
Vera Eidelman**
American Civil Liberties Union Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor

New York, NY 10004
Telephone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org
veidelman@aclu.org

Kevin Dubose*
Alexander, Dubose, Jefferson & Townsend
1844 Harvard Street
Houston, TX 77008
Telephone: (713) 522-2358
Fax: (713) 522-4553
kdubose@adjtlaw.com

ATTORNEYS FOR PLAINTIFFS

* Applications for admission are forthcoming/pending
**Admitted *pro hac vice*